*1050-14*

ORIGINAL

No.PD-1050-14
IN THE TEXAS COURT OF CRIMINAL APPEALS
AND THE NINTH DISTRICT COURT OF APPEALS FOR TEXAS
COA #09-13-00180-CR,#09-13-00181-CR,#09-13000182-CR,#09-13-00183-CR


From the 221st Judicial District Court
of Montgomery County, Texas
T.C.#12-03-02604-CR

RECEIVED IN
COURT OF CRIMINAL APPEALS

MAR 16 2015

Abel Acosta, Clerk

PETER JAMES MARTIN, Appellant,

v.

THE STATE OF TEXAS, Appellee,

---

APPELLANT'S PRO-SE MOTION FOR REHEARING
FROM DENIAL OF PETITION FOR DISCRETIONARY REVIEW

---

FILED IN
COURT OF CRIMINAL APPEALS

MAR 16 2015

Abel Acosta, Clerk

Due Date: 3/17/2015
Mailing Date: 3/12/2015
cc: State Prosecuting Attorney
    Montgomery County D.A.
    file


Respectfully Submitted,


PETER JAMES MARTIN, #1846003,pro-se
STILES UNIT, 3060 FM 3514
BEAUMONT, TEXAS 77705

# TABLE OF CONTENTS

Table of Authorities                                                     ii
Appellant's Certificate of Rule 79.2(c) Compliance                     iii
Statement of the Case, Procedural History                            iv-vi
Argument                                                               1-11

1. Legally Insufficient Evidence of Intent, Knowledge and Causation
   Contrary to USCA 14 & Penal Code §6.04(a), as the Deputy Ran From
   a Safe Location Directly Into the Path of Appellant's Already Aimed
   and Straight Moving Car's Path for Two Seconds Only Before Backing
   Out of the Way, Causing the "Threat" Himself, Requiring Reversal
   of Conviction and Rendition of a Judgement of Acquittal              1-8

   A.   Relevant Facts                                                   1-2
   B.   Standards of Review – Legal Insufficiency, Concurrent Causation  2-4
   C.   Application of Law to Facts                                      4-8

2. The Judge Violated Appellant's Rights to Proceed With Chosen Counsel 8-10

3. The Judge and 1st Counsel Unconstitutionally Aborted a Plea Bargain 8-11

   A.   Preservation                                                       8
   B.   Facts                                                            8-9
   C.   Choice of Counsel                                                9-11
   D.   Involuntary and Unknowing Rejection fo 35 Year Plea Offer      10-11

Prayer                                                                   11
Certificate of Service, Signature                                        11

And see, Attachments 1-15 in Support of Appellant's Pro-Se Motion for
    Rehearing From Denial of Petition for Discretionary Review

-i-

# TABLE OF AUTHORITIES

| | | |
|---|---|---|
| Tex.Const.,Art.I,§10 | Rights to Assistance of Counsel | 9 |
| U.S.Const.Amend.4 | Unreasonable Seizures Guarantee | 4 |
| U.S.Const.Amend.6 | Rights to Assistance of Counsel | 9-11 |
| U.S.Const.Amend.14 | Rights to Due Process | 1,2,7,8 |
| Penal Code §6.04(a) | Concurrent Causation | 1,3,4,8 |
| Penal Code §22.02(b)(2) | Aggravated Threat of a Public Servant | iv,1,7,8 |
| Tex.R.App.P.21.2 | When Motion for New Trial Required | 8 |
| Tex.R.App.P.21.5 | State May Controvert; Effect | 8 |
| Tex.R.App.P.66.3(b) | Important question of state or federal law that has not been but should be settled by TCCA | 7,8,10 |
| Tex.R.App.P.66.3(c) | Decided important question of state or federal law in conflict with decisions of the TCCA or the Supreme Court of the U.S. | 7,8,10 |
| Tex.R.App.P.79.4 | Motion for Rehearing Decision | 11 |
| Tex.R.App.P.79.2 | Motion for Rehearing Contents | i,11 |

| | |
|---|---|
| Austin v. State,748 S.W.2d 546(Tex.App.-Beaumont 1988 pet ref'd) | 8 |
| Baxter v. State,2004 Tex.App.LEXIS 4861(Tex.App.-Tyler 5-28-04 pet refd) | 3 |
| Beets v. Scott,65 F3d 1258(5th Cir.1995)(en banc) | 10 |
| Brooks v. State,323 S.W.3d 893(Tex.Crim.App.2010) | v, 2 |
| Brown v. State,183 S.W.3d 728 (Tex.App.-Hous[1 Dist]11-23-05 rehg denied 1-4-06) | 3 |
| Brown v. State,2004 Tex.App.LEXIS 9479(Tex.App.-Eastland 10-28-04) | 2,3 |
| Clarke v. State,270 S.W.3d 573(Tex.Crim.App.2008) | 8 |
| Clinton v. Stearns,780 S.W.2d 216(Tex.Crim.App.1989) | 9 |
| Degrate v. State,712 S.W.2d 755(Tex.Crim.App.1986) | 1,8 |
| Dobbins v. State,228 S.W.3d 761 (Tex.App.-Hous[14 Dist]2007) | 3 |
| Dobbs v. State,2013 Tex.App.LEXIS 3050(Tex.App.-Amarillo 3-20-13 rehg denied) | 3 |
| Estate of Starks v. Engert,5 F3d 230(7th Cir.1993) | 4 |
| Ferrel v. State,55 S.W.3d 586(Tex.Crim.App.2001) | 8 |
| Goad v. State,354 S.W.3d 443(Tex.Crim.App.2011) | 2 |
| U.S. v. Gonzalez-Lopez,548 U.S.140(2006) | 9 |
| Guevera v. State,152 S.W.3d 45(Tex.Crim.App.2004) | 2 |
| Holloway v. State,780 S.W.2d 787(Tex.Crim.App.1989) | 9 |
| Hooper v. State,214 S.W.3d 9(Tex.Crim.App.2007) | 2 |
| Jackson v. Virginia,443 U.S.307(1979) | 2 |
| Jones v. State,926 S.W.2d 386(Tex.App.-Ft. Worth 1996) | 9 |
| King v. State,125 S.W.3d 517(Tex.Crim.App.2003) | 1,10 |
| Lafler v. Cooper,No.10-209,566 U.S.___(2012) | 10,11 |
| Malik v. State,953 S.W.2d 234(Tex.Crim.App.1997) | 2 |
| U.S. v. Miller,576 F3d 528(5th Cir.2009) | 3 |
| Ollivas v. State,203 S.W.3d 341(Tex.Crim.App.2006) | 3 |
| Perkins v. State,905 S.W.2d 452(Tex.App.-El Paso 1995) | 4 |
| Powell v. Alabama,286 U.S.45(1932) | 9,10 |
| Robbins v. State,717 S.W.2d 348(Tex.Crim.App.1986) | 4,8 |
| Rochelle v. State,791 S.W.2d 121(Tex.Crim.App.1990) | 4,10 |
| Sotelo v. State,913 S.W.2d 507(Tex.Crim.App.1995) | 4,10 |
| Swann v. City of Richmond,498 F.Supp.2d 847(E.D.Va.2007) | 4 |
| Whiddon v. State,2007 Tex.App.LEXIS 916(Tex.App.-Waco 2-7-07 no pet) | 2,3 |
| Wheat v. U.S.,486 U.S.153(1988) | 9 |
| Williams v. State,235 S.W.3d 742(Tex.Crim.App.2007) | 4,7 |

# APPELLANT'S CERTIFICATE OF RULE 79.2(c) COMPLIANCE

Appellant Martin certifies that the instant motion for rehearing is grounded in the following specified substantial intervening circumstances, which are asserted in good faith and not for delay:

1. Martin's inmate legal assistant mailed the completed petition and appendix records to his family for photocopying the numbers required by the Court.
2. Martin's family made 18 copies of the petition and appendix records, and mailed them to Martin's inmate legal assistant on 10/28/14. Att.#3.
3. Prison officials notified Martin's legal assistant on 11/4/14 about receipt of the documents posing a problem. Att.#4.
4. Prison officials refused to turn over the documents to Martin's legal assistant on 11/5/14 because "legal documents on another offender". Att.#5.
5. Martin's legal assistant notified the Mailroom Supervisor, and this Court, of the confiscation of the legal documents from him on 11/5/14. Att.#6.
6. The Mailroom Supervisor responded in writing "you can't have an outside source (3rd party) mail things to you that ain't yours." Att.#6.
7. An appeal of this decision was utilized, Att.#5, which was denied. Att.#7.
8. The prison grievance system was exhausted without success. Atts.#8,#9.
9. Appellant Martin was prevented from filing anything substantive until this issue was resolved, as prison officials would not return the original petition and appendix records (or photocopies)to him of his family. Therefore an additional motion for extension of time was requested and granted. Att.#10.
10. Appellant Martin requested this Court to intervene in a "Motion to Order State to Return Confiscated Documents to Appellant", which was denied 12/19/14. Att.#11.
11. Appellant Martin's legal assistant was forced to improvise with new pleadings and different exhibits because prison officials refused to return any of the confiscated, completed originals to him pursuant to any process described hereinabove and otherwise attempted informally.
12. The improvised new pleadings and exhibits were filed in this Court on 12/31/15, Att.#12, as the final extended due date was 1/2/15. Att.#10-1 & 13.
13. Appellant Martin's improvised petition included a supplemental brief which was 34 pages long. Martin requested leave to file same, but this Court instead denied a motion for leave to exceed the page limit. Att.#14.
14. This Court refused the pro-se petition for discretionary review on 2/4/14, Appx.#15, apparently on the merits of only the petition which had unfortunately incorporated the supplemental brief cited above.
15. The instant motion for rehearing is attempting to overcome the above described interference with Appellant's good faith attempts to file an otherwise meritorious PDR brief. In that spirit Martin has selected three arguments from his previous filings, which briefly argue two Due Process issues of legally insufficient evidence, a Sixth Amendment choice of counsel claim and an inter-related involuntary and unknowing rejection of a plea bargain deal claim.

For the above stated reasons, as supported by the attached documentary evidences which are either the originals or true and correct copies of the originals, as certified and otherwise sworn to, Appellant Martin respectfully requests this Court review the instant motion for rehearing due to being grounded in the above substantial intervening circumstances preventing him from filing his originally prepared documents in this case and being forced to improvise from his legal assistant's notes and leftover evidence. Tex.R.App.P.79.2(c).

Peter James Martin

## STATEMENT OF THE CASE, PROCEDURAL HISTORY

1. This case is an appeal from four convictions in the 221st Judicial District Court of Montgomery County, based on a four count indictment alleging (CT.I) "threaten" Deputy C. Azwell by using a vehicle as a deadly weapon under 1st degree felony Penal Code §22.02(a)(2),(b)(2)(B), (CT.II) "flee" from Deputy C. Azwell by using a vehicle as a deadly weapon under 3rd degree felony Penal Code §38.04(b)(2)(A), (CT.III)"alter,destroy,or conceal""Sryinges" with "intent to impair its availability as evidence ... related to" a "Possession of Controlled Substance ... offense" under 3rd degree felony Penal Code §37.09(d), and (CT.IV) possession of a controlled substance under one gram, a state jail felony under Health & safety Code §481.115. The indictment contained five enhancement paragraphs alleging prior convictions. Clerk's Record (C.R.),39-40. Appellant Martin (Martin) pleaded "not guilty" to all counts, Reporter's Record (R.R.),v.4 p.1, but the jury found him guilty on all counts as alleged in the indictment, made an affirmative finding of a deadly weapon in the count II evading arrest count, R.R.,v.9,pp.128-29, found the first three enhancement paragraphs "true" and assessed punishments for counts I-III at "life" in prison and for count IV at twenty years in prison, all concurrent. R.R.,v.11,pp.211-12.

2. On May 4,2012 retained defense counsel Mr. Ward of the firm DeGuerin and Dickson appearsed for Martin filing a Brady motion and on May 23,2012 then trial judge Michalk ordered all exculpatory evidence produced. C.C.20-23. On August 3 & 30,2012 consecutive agreed settings for plea acceptance were sheduled, C.R.47-54, but on September 20,2012 Mr. Ward filed a Motion to Withdraw (MTW) claiming he was only hired for plea negotiations, the case was now set for trial and he was not retained to represent Martin during the trial stage. C.R., 55. See post.,pp.8-11. A Mr. Boyd represented Martin in this trial. id.

3. On January 23,2013 the State filed (1) a CD video and 11 pages of dispatch police records summarizing its contents, C.R.,167-80, and, (2) a motion in limine seeking to limit Martin from arguing he was "actually or factually innocent" (point 5) and "any investigation of Deputy Chris Azwell, whether concluded or ongoing" (point 11), amongst other items, C.R.181-85, which were all granted. R.R.,v.3,pp.7-13. Martin has no knowledge of whether the CD video itself was actually forwarded to the Court of Appeals.

4. The September 20,2012 MTW hearing and September 27,2012 Motion to Substitue hearing (MTS) reporter's records were improperly not included in the record on appeal. Martin has obtained copies thereof and included them in his Appendix at pages 10-28 as they are relied upon in part post.,pp.8-11.

5. On January 28,2013 jury trial commenced before Judge Turner replacing without explanation previous Judge Michalk. See post.pg.9(relying on the issue).

6. On January 29 & 30,2013 Mr. Boyd presented a Bill of Exception attempting to attack the credibility of Deputy Azwell,the main witness against Martin, arguing the count I threat of a public servant charge was false, a "cover-up" of Azwell's "unnecessary shooting" of Martin to arrest him, R.R.,v.7,pp.1-37, 19-21, by introducing as a "Sealed Appellate Record" a DVD interview of Azwell and his police provided lawyer concerning Martin's arrest and shooting, and of the lawyer asking Azwell "isn't there one more thing that you forgot or wish to tell" about this arrest and shooting, which the trial court refused to allow before the jury. id.,pp.8-9,20-21,40-43.

7. Motions for new trial were filed, C.R.220,226, arguing, in parts, that (1) originally retained trial counsel Dick DeGuerin and Mr. Ward renderred ineffective assistance of counsel denying Martin choice of counsel and a 35 year plea offer, aggravated by previous trial judge Michalk's on record advice to Martin to pay Mr. Ward an additional $35,000.00 or else Mr. Ward "will not want to do a good job for you"-see post.,pg.8-11(Issues 2 & 3);   C.R.226-27 , (2) the trial court improperly refused to allow the defense to present any evidence offered to attack Deputy Azwell's critical trial testimonies, C.R.227; R.R.,v.9(DVD video), and, (3) the trial court improperly denied trial counsel Mr. Boyd's request for assistance in conducting the motion for new trial, since Mr. Boyd was "traumatized" by the substance and result of Martin's trial thus "[n]eeded the help" of an appeal counsel and early preparation of the trial transcripts. C.R.228-31; R.R.,v.13,pp.5-20; R.R.v,14,p.8.

8. Timely notices of appeal were filed. C.R.234-35.   Appeal counsel Mr. Allen was then appointed. R.R.,v.13,pp.5-9,13,18-20.

9. On December 10,2013 appeal counsel filed an "Appellant's Brief" arguing one issue of a failed motion for mistrial. On February 10,2014 the State res- ponded to the argument.

10. On March 17,2014 Martin filed a pro-se motion complaining about appeal counsel's "only argument" disregarding the major defenses presented in his trial., criticized counsel's lone argument as meritless, and stated counsel refused to allow him to participate in his own appeal by denying him copies of his trial transcripts. Appx.49-52, 03-17-14 Pro-Se Motion,1-4(w/att'd record of letters to counsel and the trial court). On March 20,2014 the Court ruled since appeal counsel "already filed a brief on the merits" that the Court "would not consider any pro-se submissions while a party was represented by counsel". Appx.48-Clerk's Notice.

11. On May 21,2014 the Court affirmed Martin's convictions and sentences. Appx.33-41, Opinion & Judgement. The Court then purported to conduct an evidence sufficiency analysis stating "[t]he evidence of Martin's guilt leads to the conclusion that Martin's prospects of being acquitted on any of the charges for which he was tried were highly unlikely." Appx.38-Mem.Op.,6. This is not the standard of review in Texas for legal sufficiency analysis, a "highly unlikely" standard. E.g., In re Winship,397 U.S.358,361-68(1970)(rejecting conviction based on a preponderance of the evidence standard, requiring proof beyond a reasonable boubt standard; rev'g conviction): Brooks v. State,323 S.W.3d 893, 894-95(Tex.Crim.App.2010)(overturning Texas factual insufficiency standard of review, in favor ofFederal "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" standard). **For this reason alone the Court should vacate and remand for a proper legal suffic- iency analysis review.**

12. The Court's opinion (1) did not address the legal sufficiency of the evi- dence to support the deadly weapon enhancement of the evading arrest charge, Appx.38-Mem.Op.,6, A HOTLY CONTESTED ISSUE IN TRIAL, (2) concluded only Deputy Azwell's testimony supported the aggravated threat of a public servant convict- ion, but improperly omitted exculpatory, relevant facts from it's analysis, id.,6-7, ANOTHER HOTLY CONTESTED ISSUE IN TRIAL.

13. On June 13,2014 Appellant filed a pro-se 57 page motion for rehearing and motion to exceed the page limits, but on June 26,2014 the Court of Appeals denied the motion to exceed the page limits and sua sponte extended the time limit until July 21,2014 to file the motion for rehearing. In this motion Martin attempted to raise the following issues: (1) Double Jeopardy prohibitions on multiple punishments for the same conduct in Counts I and II required the Count II evading arrest conviction to be vacated; (2) Due Process required the Count III conviction to be reversed and acquitted for legally insufficient evidence of "Syringes" being "related" to the offense of "Possession of a Controlled Substance" and due to no affirmative link of the "Syringes" to Martin in this case; (3) Due process required the Count I aggravated threat of a public servant conviction to be reversed and vacated due to legally insufficient evidence of Martin "threatened" Deputy C. Azwell, Deputy C. Azwell falsely testifying in trial to the alleged threat, and Deputy Azwell being the sole cause of any alleged threat; (4) Due process required deletion of the evading arrest affirmative finding of a deadly weapon by use of a motor vehicle holding from the judgement, based on legally insufficient evidence of Martin's actually endangering anyone by proximity; (5) Due Process required reversal of the count I conviction for aggravated threat of a public servant, as Deputy Azwell violated USCA 4 and Penal Code §6.04(a) to cause by himself any alleged "threat" to Deputy Azwell, because Deputy Azwell falsely testified to being in front of Martin's car when firing his weapon at Martin when in fact the evidence shows he shot at Martin from the side of Martin's car and his fellow deputy knowingly suppressed critical evidence and facts proving Deputy Azwell was NEVER in front of Martin's car at ANY time as falsely testified to in trial; and (6) the Sixth Amendment rights to effective assistance of counsel, choice of counsel (as also protected by Tex.Const.Art.I,§10) and to conflict free counsel were violated in five specific trial and direct appeal issues. 6-23-13 Orig.Mot.for Reh'g.

14. On July 21,2014 Martin filed a necessarily severely truncated 15 page amended motion for rehearing in the Court of Appeals. On July 24,2014, the Court of Appeals "overruled" without written opinion Martin's amended motion for rehearing. Appx.45-Clerk's Notice. Presumably, this decision did not consider the underlying merits of ANY issue Martin raised. Hanby's Texas Rules of Appellate Procedure, Annotated,204(West's 2011 ed.)[citing, Rochelle v. State,791 S.W.2d 121,124(Tex.Crim.App.1990)].

15. On August 7,2014 Martin timely filed a pro-se Motion for En Banc Consideration in the Court of Appeals, which was also "overruled" without written opinion on September 4,2014. Appx.42-Clerk's Notice. On August 14,2014 Martin also served a pro-se Motion to Abate Appeal and Remand to the trial Court for Fact Findings on his ineffective assistance of appeal counsel and denial of a meaningful appeal due process claims, amongst other issues, but the Court of Appeals never decided this motion.

16. A duplicate or similar Motion to Abate Appeal and Remand to the Trial Court for Fact Findings was filed in this Court and subsequently "denied" also.

17. Several motions for extensions of time were filed and granted, with the petition and a supplemental brief being filed on December 31,2014. This Court construed the motion for leave to file the supplemental brief as a motion to exceed the page limits, denied the motion to exceed, Att.#14, and refused PDR on February 4,2015. Att.#15. A motion for extend time to request a rehearing was granted extending the deadline to file until March 17,2014.

1. LEGALLY INSUFFICIENT EVIDENCE OF INTENT, KNOWLEDGE AND CAUSATION CONTRARY TO USCA 14 & PENAL CODE §6.04(a), AS THE DEPUTY RAN FROM A SAFE LOCATION DIRECTLY INTO THE PATH OF APPELLANT'S ALREADY AIMED AND STRAIGHT MOVING CAR'S PATH FOR TWO SECONDS ONLY BEFORE BACKING OUT OF THE WAY, CAUSING THE "THREAT" HIMSELF, REQUIRING REVERSAL OF CONVICTION AND RENDITION OF A JUDGEMENT OF ACQUITTAL

## A. Relevant Facts

1. "With respect to Martin's conviction for aggravated assault against a public servant, Deputy Azwell testified that Martin, in attempting to evade arrest, tried to run him over with his car. See §22.02(b)(2). Martin did not testify at the trial, and the video admitted into evidence that captured Martin evading arrest does not include the part where Martin used his car in an effort to run over Deputy Azwell. Nonetheless, Deputy Azwell's testimony about Martin's having driven directly at him as the chase was ending is not contradicted. According to Deputy Azwell, he fired several shots at Martin's car when Martin drove toward him. Based on Deputy Azwell's testimony, it is unlikely that the jury would have chosen to acquit Martin on the charge that he committed an aggravated assault against a public servant. Additionally, nothing in the record supports a conclusion that the jury might have given Martin another punishment on the charge." Appx.38-39, Mem.Op.,6-7.

The Court of Appeals erred by omitting relevant, exculpatory facts from it's analysis, implicating a legal sufficiency issue of great importance to Texas jurisprudence which this Court has yet to address, but should address, because it has important impact on the interests of justice in other "public servant" cases, hence a PDR should be granted on this issue. DeGrate v. State,712 S.W.2d 755,756(Tex.Crim.App.1986); King v. State,125 S.W.3d 517,520(Tex.Crim.App.2003) (Cochran,J.,concurring).

2. The above quoted sufficiency analysis failed to consider the incar video exhibits contents and related testimony and exhibits that uncontrovertedly establish Deputy Azwell's patrol car's location when he exits it, his exit being heard clearly on the incar video's audio by a door slam, and four seconds later he is shooting at Appellant while backing out of the way of Martin's car's path. R.R.,v.10-State's Ex.204(incar video shows patrol car's parked location and four second timeline); Att.#1, R.R.,v.10-State's Ex.215("Lieca Scan" drawing of resident's lawn, house, garage, driveway and Martin's straight, unswerving path driving across it); Appx.1, R.R.,v.5,pp.85-86(Azwell's supporting testimony showing he ran out of his car parked on driveway, and directly into path of Martin's car momentarily).

3. The incar video shows Deputy Azwell pursues Martin onto a dead end street, and fully around one circle through a resident's lawn, parking his patrol car on the street end of the resident's driveway with two other cars at the other end nosed up against the garage. R.R.,v.10-State's Ex.204(incar video evidence). The testimony is that next Martin continued to evade by driving around a second circle through the resident's lawn while Deputy Azwell's patrol car remained parked on the street end of the driveway. Appx.1, R.R.,v.5,pp.85-86(Azwell).

4. The relative positions of the resident's lawn, house, garage, driveway, and Martin's unswerving, direct driving path across the driveway while Deputy Azwell shoots at Martin, are shown by the State's "Lieca Scan" exhibit, which

significantly omits the location of Azwell's patrol car when parked on the street end of the driveway as Martin crosses the driveway. Att.#1, R.R.,v.10-State's Ex.215("Lieca Scan" drawing).

5. Deputy Azwell testified his chosen driveway parking position created a "car-length-and-a-half" space between the rears of his patrol car and the resident's two cars already parked at the other end. Appx.1, R.R.,v.5,p.86.

6. Critically unrecognized in this court of appeals opinion, is the exculpatory difference between Martin driving his car unswervingly direct, aimed at the space between cars on the driveway BEFORE Deputy Azwell exited his patrol car and ran into that very space deliberately into the path of Martin's already already aimed and moving car, and Martin driving his car directly at Deputy Azwell for two seconds only AFTER Deputy Azwell exited his patrol car and had run into the space between cars deliberately into the path of Martin's already aimed and moving car. The former poses no "threat" as alleged in this case, and the latter was not done intentionally or knowingly because Deputy Azwell's conduct, by itself, caused any "threat" as alleged in this case and not Martin.

7. It is undisputed that before this encounter on the dead end street, Martin was driving "reckless". R.R.v,5,p.79; R.R.,v.6,pp.66-67(testimonies of Hadrych and Azwell).

8. The jury was shown Martin had only 1 eye. R.R.,v.9,pp.37-38,41-42,47-48.

## B. Standards of Review - Legal Insufficiency, Concurrent Causation

9. In order to determine if the evidence is legally sufficient under Due Process, we must review **all of the evidence** in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.307,318-19(1979)(bold added). See Whiddon v. State,No.10-06-00085-CR, 2007 Tex.App.LEXIS 916 @ *2(Tex.App.-Waco 2/7/2007 no pet)(aff'g §22.02(b)(2)(B) case); Brown v. State,No.11-03-00253-CR,No.11-03-00254-CR,2004 Tex.App.LEXIS 9479 @ *4(Tex.App.-Eastland 10/28/2004)(rev'g §22.02(b)(2)(B) conviction),pet ref'd,In re Brown,2005 Tex.Crim.App.LEXIS 582(4/13/2005). This is the only standard for sufficiency of evidence, Brooks v. State,323 S.W.3d 893,894-95(Tex. Crim.App.2010).

10. Sufficiency is reviewed on the combined and cumulative force of the evidence, not by viewing each fact in isolation. Goad v. State,354 S.W.3d 443,450 (Tex.Crim.App.2011). A court of appeals may not substitute its judgement for the judgement of the factfinders by re-evaluating weight or credibility. Brooks, supra. But the factfinder's resolutions of conflicts in the evidence must be rational and inferences drawn reasonable. Hooper v. State,214 S.W.3d 9,15-16 (Tex.Crim.App.2007). Conclusions reached by speculation might not be completely unreasonable, but it is not sufficient to support a finding of beyond a reasonable doubt. id.

11. For purposes of a sufficiency analysis, the elements of the offense are defined by reference to a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234,240(Tex.Crim.App.1997). Circumstantial evidence is as probative as direct evidence in establishing the guilt or innocence of the actor. Guevera v. State,152 S.W.3d 45,49(Tex.Crim.App.2004). On appeal, the same standard

-2-

of review is applied to both circumstantial and direct evidence. Id.

12. In cases like Martin's of assault by threat against a public servant via use of a motor vehicle as a deadly weapon, before a jury can convict, the State must produce legally sufficient evidence of intent or knowledge, to prove beyond a reasonable doubt either a conscious objective to threaten a public servant with imminent bodily injury, or, an awareness that one's conduct was reasonably certain to threaten a public servant with imminent bodily injury. Brown,2004 Tex.App.LEXIS 9479 @ *5; Whiddon,2007 Tex.App.LEXIS 916 @ *3. It is not enough that the appellant was either reckless or negligent. Brown,infra. @ *5. It is irrelevant whether the public servant felt threatened, since the crucial inquiry remains whether the appellant's proven driving conduct posed "an immediate threat of danger to a person of reasonable sensitivity." Whiddon,infra. @ *4[quoting, Olivas v. State,203 S.W.3d 341,347(Tex.Crim.App.2006)].

13. Caselaw establishes that in order to prove beyond a reasonable doubt an appellant intentionally or knowingly threatened a public servant with imminent bodily injury by driving a car directly at the officer, it must be proven by circumstantial evidence or otherwise that relates to the appellant's culpable mental state with regard to the officer specifically, that the appellant's conscious objective was to threaten the officer with imminent bodily injury, or the appellant was reasonably certain that he would threaten the officer with imminent bodily injury. Brown,2004 Tex.App.LEXIS 9479 @ **5-6(rev'g & acquitting); Cf: Dobbs v. State,2013 Tex.App.LEXIS 3050 @ **2-4(Tex.App.-Amarillo 3/20/13 reh'g denied)(finding sufficiency, as appellant "accelerated towards him. The officer fired his weapon as the car approached and then jumped out of its path just before it could strike him."); Dobbins v. State,228 S.W.3d 761,765-66(Tex.App.-Hous.[14 Dist]2007)(finding sufficiency, as appellant drove directly at officer, stopped at officer's direction, then moved car forward striking officer); Whiddon 2007 Tex.App.LEXIS 916 @ *4(finding sufficiency, as appellant "drove toward the trooper, and failed to hit the trooper only because the trooper moved and shot out Whiddon's tire."); Baxter v. State,2004 Tex.App.LEXIS 4861 @ *6(Tex.App.-Tyler 5-28-04 pet ref'd)(finding sufficiency, as appellant drove his car directly towards the officer in an attempt to escape); U.S. v. Miller,576 F3d 528, 529-30(5th Cir.2009)(finding sufficiency, as appellant was trying to escape by driving through a narrow gap between 2 officer's 2 cars, while the 2 officers were standing in that gap and had to jump out of the way). When the evidence is uncontroverted that an appellant's car did not swerve but rather drove straight for the only available exit to continue evading arrest, the evidence will be legally insufficient to establish the appellant intentionally or knowingly threatened the officer by driving his car at the officer. E.g., Brown v. State, 183 S.W.3d 728,732-33(Tex.App.-Hous[1 Dist]11/23/05 reh'g denied 1/4/06)( evidence was conflicting as to whether appellant's driving swerved away after being shot at by officer, or merely sped off toward the exit, holding it was error to not charge jury on reckless driving, but finding error was harmless here). There appears to be no §22.02(b)(2) caselaw involving an officer that runs directly in front of the appellant's car as a prelude to the alleged "threat".

14. Additionally, Penal Code §6.04(a)(Concurrent Causation) provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, **unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.**" (bold added)

-3-

15. Under the "unless" clause of §6.04(a), if Martin's driving "was clearly not sufficient by itself", to result in the threat alleged in the indictment, "but the conduct of another was clearly sufficient, then the evidence is not legally sufficient to submit the case to a jury or to sustain a conviction." Williams v. State,235 S.W.3d 742,769(Tex.Crim.App.2007)(rev'g conviction for legal insufficiency); accord, Robbins v. State,717 S.W.2d 348,351(Tex.Crim.App. 1986)("If the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result and the defendant's conduct by itself, is clearly insufficient, then the defendant cannot be convicted."), vacating, on remand,716 S.W.2d 117(Tex.App.-El Paso 1986)(jury charge error on §6.04(a), rev'g & rem'dg for new trial); Nugent v. State,749 S.W.2d 595,598 (Tex.App.-Corpus Christi 1988 pet ref'd)("There was evidence that Meza turned his vehicle into the path of" appellant's car, court held "the trial court should have applied the law of concurrent causation to the facts in this case and charged the jury that if it found Meza's conduct clearly sufficient to cause the accident and Nugent's clearly insufficient to cause the accident, they should acquit the defendant.": rev'g & rem'dg for new trial).

## C.   Application of Law to Facts

16. In Martin's case, the incar video evidence and Deputy Azwell's testimony indisputably establish, in four seconds total, Deputy Azwell exited his patrol car slamming the door, ran into the "car-length-and-a-half" space between the rears of his car and the resident's cars, stopped directly in the center of this space which was also directly in the center of Martin's car's already aimed and unswerving path, then shot at Martin while backing out of the way. This conduct has been held to demonstrate the officer unreasonably created the very encounter that ostensibly justified shooting the driver of the evading vehicle in violation of the Fourth Amendment to the U.S. Constitution. Swann v. City of Richmond,498 F.Supp.2d 847,863(E.D.Va.2007)[citing, Estate of Starks v. Engert,5 F3d 230,232,234-35(7th Cir.1993)]. Additionally, Martin requests this Court take judicial notice of the United States Congress recent pressuring of Customs and Border Patrol agents and officers ("CBP") into "rethinking its recalcitrant response" to "some border agents stood in front of moving vehicles as a pretext to open fire", resulting in CBP Chief Michael Fisher announcing in March 2014 "official changes to the Border Patrol's use-of-force policy. Agents would be prohibited from stepping in front of moving cars ...". See, attached Texas Monthly article,p.7(@ http://www.texasmonthly.com/story/who-will-watch-the-watchers?fullpage=1). Perkins v. State,905 S.W.2d 452,453(Tex.App. El Paso 1995)[citing, Rochelle v. State,791 S.W.2d 121,124-25(Tex.Crim.App. 1990)](authorizing judicial notice of non-record materials att'd to a motion for rehearing for Due Process concerns or the interests of justice). It thus appears there exists problems with law enforcement officer's employing pretexts such as jumping in front of moving vehicles, to shoot at the driver, out of frustration, not a sense of endangerment, and then trying to cover it up. Such a result should be protected against, by this Court's grant of rehearing and PDR.

17. Martins reprinted record excerpts in his Appendix,pp.1-2, are as follows:
(State's direct examination)
State: So when you got out of your car, tell us where you went.
Azwell: From that point, I went to the rear of my patrol car. There was approximately a car length and a half space between my patrol car and the vehicles parked on the driveway. I had nothing else to use to contain Mr. Martin and his vehicle. I stepped directly in between these vehicles and my patrol car, and made eye contact with Mr. Martin through the windshield of his patrol car (sic) and gave him a visual signal to stop at that point. R.R.,v.5,p.86.

-4-

Q. And at that point, do you have your duty weapon drawn?

A. Yes, I did draw my duty weapon. ...

Q. What did Peter Martin do when he saw you ...

A. I remember he made eye contact with me. And he accelerated aggressively and I remember grass from the yard flying up, and he came directly at me. ... I knew he was going to try to get out of there at any cost, and it didn't matter if I was standing in the way or not. R.R.,v.5,pp.87-88. ...

Q. ... How were you able to get out of there?

A. Just by moving out of the way of the vehicle coming towards me. And actually just narrowly. I mean he probably passed maybe a foot, a foot and a half next to my body.

Q. ... If I'm driving straight towards you like this, which way did you back out of the way?

A. I backed out of the way towards my vehicle to take cover behind my vehicle.

Q. So you were favoring towards the passenger side of the defendant's car?

A. Correct.

Q. Is that when you fired these shots in that moment?

A. Out of — once again — out of fear of my — fear of my own welfare, my own life. And not only the resident's that were in the area. Kids and everybody else. ...

Q. Immediately after the shots were fired you've moved out of the way, what is the very next thing you have to do?

A. I — he continued to evade. And I got back into my patrol car and continued to pursue. R.R.,v.5,pp.89-90. ...

(Defense's Cross Examination)

Q. ... There is some shots that we hear on one of those tapes, I guess. Was that on the tape, do you think?

A. That's correct.

Q. But no video at all.

A. Not of the shooting.

Q. And basiccaly we just have your word, don't we?

A. At this point. ... R.R.,v.6,p.14.

Q. ... the car is approaching. Let's just say I'm the car. ... I'm in the driver's seat, right? Okay. Am I coming this way like this, and the — which way?

A. Directly at me, yes.

Q. Directly at you like this?

A. Yes sir.

Q. And then what? Then what did you do?

A. As I made the split second decision to move out of the way, I fired three shots at him.

Q. At him.

A. Yes.

Q. All right. ... And when were you firing the shot?

A. First shot was approximately here, was across the front of the car through the front of the windshield. Then, as I moved out of the way, he passed by.

Q. And then what?

A. Then two shots were rapid fire right after that. One through the side window and one into the — ...

Q. All three shots were fired before the car passed you?

A. That's right. ...

Q. So how fast were these shots fired?

A. All three shots were fired within, I would say, a second to a second and a quarter. ... R.R.,v.6,pp.19-21.

[End of Record Excerpts from Appx.,1-2]

-5-

18.   The   combined and cumulative force of all the circumstantial evidence rele-vant   to   Martin's   driving   directly   at   Deputy Azwell, makes it irrational to conclude Martin's momentarily   driving   towards Deputy Azwell was either intent-ional   or   knowing. The only way this could be concluded is by ignoring the facts that   Deputy   Azwell   ran directly in front of Martin's already aimed and moving car,   for   two seconds, and then jumped out of the way again, which is what hap-pened   in   this jury trial and is the reversible error committed in this appeal. The   incar   video   establishes   the   4 second timeline between Azwell's slamming his car door   and   shooting at Martin while purportedly backing out of the way of Martin's car's path. Deputy   Azwell's   testimony   establishes   he   exited the driver's   side of his patrol car while Martin was approaching from the passenger side   of   his   patrol   car,   from   there he ran into the space between the rears of his car   and   the   resident's cars on the driveway and testifies right then that   Martin's   car   was coming directly at him without stating the obvious that Martin was already aimed   straight and direct for the only avenue of escape between   the   two   cars   on   the   driveway, and then he testifies that he shoots at Martin while backing out of the way. Common   sense   dictates that this direct encounter between Azwell and Martin had   to   take   no   more   than two or two and a half seconds, as   slamming   the   patrol car door and running clear of the rear of   the   patrol   car had to take one and a half or two seconds, for four seconds total. There   is   no testimony that Martin swerved towards Azwell or in any kind of   direction   except   for   Deputy   Azwell's   testimony that Martin was driving directly towards him and the space between the rears of his car and the resi-dent's cars on the driveway. Hence,   Martin   was   aiming for that space between cars BEFORE   Deputy   Azwell   ran   into   that space, and AFTER Deputy Azwell had backed out of that space given the testimony and the "Lieca Scan" drawing State exhibit. It   is   unreasonable   to   conclude that Martin, a man with only one eye (and therefore distorted depth perception), could   have   a   conscious   objective to threaten Deputy Azwell with imminent bodily injury by driving directly toward him   for two seconds, after Deputy Azwell had unforseeably run directly in front of Martin's car for those two seconds. It   is   unjust   to   hold   a man with only one   eye   criminally   liable   for   Deputy Azwell's unexpectedly running directly in   front   of   Martin's   car's   path   for merely two seconds, in what appears to be   a   calculated   decision   on   Deputy Azwell's part to justify shooting Martin instead of his tires   to   stop him from evading arrest. Persons of reasonable sensitivity   would   not   find that Martin posed an immediate threat of danger to   Deputy   Azwell,   but   that   if anyone is responsible for an immediate threat of   danger   to   him   it   was Deputy Azwell's act of running directly in front of Martin's car and then out of the way again. Martin's   pre-existing   culpable mental   state   of   recklessness never rose up to an intentional or knowing state of mind under the totality of these circumstances.

19.   During   the   first 1½ to 2 seconds   when Deputy Azwell slammed his car door and   ran   to   clear   the   rear end of his patrol car, there is no evidence other than   Azwell's   testimony   that   Martin's driving was direct or straight, nor Martin was ever not aiming for the space between cars on the driveway and aiming for Deputy Azwell instead. During   this   time,   Deputy   Azwell   was protected by his   patrol   car   being between Martin and himself, and the fact that Martin was still   trying to evade arrest by driving towards the   space   between   the   rears of the cars parked on the driveway. Appx.1-2[quoting   excerpts   from   R.R.,v.5, pp.87-88 & R.R.,v.6,pp.19-20]. Captain Hadrych who was there but did not witness the shooting encounter, testified of this moment, "At that time, I realized he's trying to gain access back to the road, back to the pavement." R.R.,v.6,p75.   As such,   there   is   no evidence Martin was aiming for Azwell during the first half of this encounter.

-6-

20. During the last 2 or 2½ seconds of this encounter after Deputy Azwell had run clear of the rear of his patrol car, into the space between the rears of his patrol car and the resident's cars parked on the driveway (misleadingly testified to by omitting the fact that Martin was already aiming for this space between cars at that point to continue evading), drew his weapon, made a visual command to stop and then shot at Martin (the testimony is Azwell shot at Martin, not at his car as erroneously found below, compare Appx.3-R.R. v.6,p.20, w/Appx.39-Mem.Op.7) while backing out of the way, it is unreasonable or speculative to conclude beyond reasonable doubt that Martin right then in those 2 to 2½ seconds, having only one eye, had formed a conscious objective to run over Deputy Azwell, who had unexpectedly run directly in front of Martin's car momentarily. No person of reasonable sensitivity could find that Martin posed a threat of immediate danger to Deputy Azwell, but rather a person of reasonable sensitivity would find that Deputy Azwell posed whatever threat of immediate danger to himself the State could somehow be argued to rationally have resulted in in a threat top the deputy. Martin was merely reckless.

21. Deputy Azwell's conclusory testimony that Martin made eye contact with him is obviously speculation, and certainly not beyond a reasonable doubt given Martin had only one eye and the associated vision depth perception problems.

22. That Martin's drive tire kicked grass up in the air is not a sign of his intent beyond a reasonable doubt due to "accelerated aggresively", but rather nothing more than while Martin's car was driving in the two circles on the lawn's grass G forces onto the drive tire's side was coming from the dirt under the lawn's grass; hence when Martin drove straight after coming out of the second circle there was a sudden loss of traction onto the side of the drive tire naturally resulting in the grass flying up.

23. The combined and cumulative force of all the circumstances relevant to Martin's intent or knowledge to run over Deputy Azwell were not considered by the Court of Appeals below, which when properly considered fails to prove beyond a reasonable doubt Martin intentionally or knowingly threatened Deputy Azwell by driving directly at him to run him over. During the critical 2 -2½ seconds of time, Martin did nothing other than continue to evade, and thus is indicative of his continued recklessness. Therefore, PDR should be granted on this issue of whether Due Process was violated here by legally insufficient evidence of Martin's intentionally or knowingly driving directly at Deputy Azwell under Penal Code §22.02(b)(2). Tex.R.App.P.66.3(b),(c)

24. Also, the causation evidence of driving directly for the space between cars which both Captain Hadrych and Deputy Azwell testified was for the purpose of continuing to evade arrest, is legally insufficient BEFORE Deputy Azwell ran into that space momentarily till AFTER Deputy Azwell had run out of that space, because Martin's conduct as such "was clearly not sufficient, by itself" to result in Deputy Azwell's being threatened with imminent bodily injury, and the conduct of Deputy Azwell in momentarily running directly into the path of Martin's already aimed and straight moving car (pretextually) was clearly sufficient, by itself, to result in any arguable threat to Deputy Azwell that might have occurred here. Williams,235 S.W.3d @ 769; Nugent,749 S.W.2d @ 598; Penal Code §6.04(a). Nothing Martin could be arguably proven to have done after Azwell had put himself in front of Martin's car for those two seconds, suffices to prove Martin's reckless mental state rose to intentional or knowing beyond a reasonable doubt. Gooden v. State,750 S.W.2d 857,859,861(Tex.App.- Corpus Christi 1988 no pet)(repo-man case WHERE COURT EXAMINED DRIVER'S CONDUCT ONLY AFTER repo-man "climbed onto the hood of the car" then "appellant drove ... with him on the hood" to sustain conviction).

-7-

25. The Beaumont Court of Appeals committed nearly the same error committed in Ferrel v. State,55 S.W.3d 586,590-91(Tex.Crim.App.2001) where the court of appeals erroneously "focus[sed] solely on the impact from the blow of the beer bottle - ignoring the fact that because of that blow McManus fell back, hit his head on the ground and died." id.(vacating and reinstating rev'd conviction under §6.04(a)). Here, the Beaumont Court of Appeals focussed solely upon Martin driving directly at Deputy Azwell - overlooking the uncontroverted fact Deputy Azwell momentarily ran directly in front of Martin's car, w/Azwell causing the danger. The deputy caused any arguable result of his own self being "threatened" by Martin's car driving directly at him under §22.02(b)(2). This is exactly the sort of omission of relevant facts from an appeal opinion that this Court looks for to grant a PDR. Ferrel,55 S.W.3d @ 690-91; Degrate,712 S.W.2d @ 756. Therefore, rehearing and PDR should be granted on whether there was legally insufficient evidence under Texas Penal Code §6.04(a) of Martin's causing Deputy Azwell to be "threatened" under the State's theory of this case. Tex.R.App.P.66.3(b),(c); Robbins,717 S.W.2d @ 349(granting appellant a rehearing on meritorious §6.04(a) jury charge issue, vacating),on remand, rev'g, 717 S.W.2d 717.

**2. THE TRIAL COURT JUDGE VIOLATED APPELLANT'S RIGHTS TO PROCEED WITH CHOSEN COUNSEL**

**3. THE JUDGE AND 1st COUNSEL UNCONSTITUTIONALLY ABORTED THE PLEA BARGAINING PROCESS**

## A. Preservation

Unobjected facts necessary to support the above grounds for relief are preserved in two pre-trial hearings omitted from the Reporter's Record but are presented in Appellant's Pro-Se Appendix,pp.10-28(Sept.20,2012 MTW Hearing & Sept.27,2012 MTS Hearing), and in trial counsel's Motion for New Trial. See, R.R.,v.12-Def's Exs.1-4; R.R.,v.13,pp.1-13(trial court's denial of trial counsel request for preparation of transcripts for motion for new trial purposes, and assistance of appellate lawyer for same); R.R.,v.14,pp.1-77(same,pp.1-21; facts in support of motion,pp.22-71; denial,p.73). Tex.R.App.P.21.2,21.5; see, Clarke v. State,270 S.W.3d 573,580-81(Tex.Crim.App.2008)(issue preserved as it was litigated without objection at the hearing, even though motion did not explicitly raise the issue; "there is nothing in the Rules of Appellate Procedure which requires that a written motion for new trial precisely identify the contours of a defendant's ground for granting a new trial."); Austin v. State,748 S.W.2d 546,548(Tex.App.-Beaumont 1988,pet.ref'd)(holding if the State fails to controvert the motion or present conflicting evidence, the defendant's version of the facts will be taken as true).

## B. Facts

Trial counsel complained on motion for new trial about issues raised in pre-trial motions to withdraw and to substitute counsel and during the new trial hearing. C.R.,226-27[incorporating trial counsel's "'ineffectiveness' ground of his is inartfully expressed" at C.R.220-22]. Martin's family issued on 4/27/12 a cashier's check for 55,000.00 to Dick DeGuerin for his attorney fees and expenses, DeGuerin's staff attorney Todd Ward received the funds and issued a 4/30/12 letter on DeGuerin letterhead informing Martin's family this "does not include the fee for going to trial". R.R.,v.12,D.Ex.1-3. Mr. Ward said during his motion to withdraw, that he had gotten the State's plea offer down from 50 yrs "agg" to 40 yrs "agg", to which the State responded with a 35 yr "agg" offer, to which Ward responded with "he's already rejected it", followed by the State's assertion "the [new] offer is gone." Sept.20,2012 MTW Hearing,8

-8-

Trial counsel's complaint was Ward and DeGuerin took $55,000.00 from Martin's mother and would not go to trial when plea negotiations failed. R.R.,v.1,pp.26-27; Appx.14-Sept.20,2012 MTW Hearing,5. Trial counsel's first appearance in this case was **to defend Martin against Mr. Ward's attempt to withdraw** from representing Martin when plea negotiations failed. Appx.15-16-Sept.20,2012.MTW Hearing,6-7. **The issue** was after plea negotiations failed, Mr. Ward demanded an additional $35,000.00 from Martin to go to trial, but Mr. Martin's family didn't have any more money to pay. R.R.,v.14,pp.30,37. One problem was that noone told Martin that Ward's representation was conditional and did not include going to trial, so when Martin rejected any plea offer, he did so unknowingly and unintelligently as Martin only discovered there was a "contract" for only plea negotiations at the motion to withdraw hearing. R.R.,v.14,pp.26-27; and see, Appx.14-Sept.20,2012 MTW Hearing,5. The most significant problem, though, was trial judge Lisa Michalk's response to this issue on the record was, **"Here's the deal. You have to pay your attorney. Otherwise, your attorney is not going to want to do a good job for you."** id. This was trial counsel's main complaint. C.R.220-21("The said judge ... aggravated the problem by lecturing the defendant in effect that these lawyers might not do an enthusiastic job in defending defendant if they were'nt paid their fee","... the defendant could not have faith in these lawyers properly representing this defendant especially after hearing the judge's remarks ...","Thus the ineffectiveness and denial of defendant's first choice of counsel, caused by state action by way of the District Judge who presided over the case at the time was apparent."),C.R.226-27(incorporating by reference this argument); R.R.,v.14,p.27 lns,10-20,p.28 lns.1-5, p.37 lns.5-15,p.50 lns.20-25,p.71 lns.20-21. Judge Michalk's statement caused Martin to change his strategy of forcing Ward to represent him in trial, to dismissing Ward from representing him in trial. See, Appx.23-27-Sept.27 MTS Hearing,4-8: SEE Martin's testimony in support, R.R.,v.14,pp.30-33,36 lns3-11,p.37 lns.9-15,p.41 lns.22-23. The State responded by arguing what a great job Mr. Todd and Mr. Boyd had done for Martin. R.R.,v.14,44-49,pp.69-70 lns.4-25,1-8. The State did not respond to the choice of counsel violation argument, but only the denied plea bargain argument. id. Before trial Judge Michalk removed herself as trial judge, replaced by the Honorable Mary Anne Turner whose only expressed concern with this substitution was for whether Martin's 'choice of counsel' going forward was being respected. R.R.,v.4,p.137 ln.12 to p.138 ln.14.

## C.   Choice of Counsel

The Sixth Amendment confers a right to retain the attorney of one's choice. Powell v. Alabama,286 U.S.45,53(1932). The right to choose counsel can be violated even if an erroneously substituted counsel is effective because the choice versus the quality of representation are distinct rights. U.S. v. Gonzalez-Lopez,548 U.S.140,147-48(2006). While this right is not absolute under USCA 6, giving trial courts the right to balance counsel of choice against the interests of judicial integrity and efficiency, Wheat v. U.S.,486 U.S.153,162(1988), this specific right IS absolute under Texas Const.Art.I,§10. Jones v. State,926 S.W.2d 386,390-91 & nn.21,22(Tex.App.-Ft. Worth 1996)[citing, Holloway v. State, 780 S.W.2d 787(Tex.Crim.App.1989) & Clinton v. Stearns,780 S.W.2d 216(Tex.Crim. App.1989)].

Martin's family paid Attorney Dick DeGuerin $55,000.00 to defend him in this case yet only associate counsel Mr. Ward represented Martin during plea negotiations alone, and when they failed Ward demanded $35,000.00 more to go to trial (which Martin's family did not have) according to Ward's purported

-9-

contract with the family for only pre-trial negotiations. However, Ward never told Martin of any "contract" or it's clause requiring more funds to continue to trial, until the motion to withdraw hearing of September 20,2012. Thus, up to that point, Martin thought he had "the best representation...a very prestigious law firm" to take him to trial which was why Martin turned down 40 and 35 year plea offers. R.R.,v.13pp47-49(State's cross). Martin came to the motion to withdraw hearing armed with Mr. Boyd to force Mr. Ward to defend him in trial. However, as the record clearly shows without objections from the State on the record, trial judge Michalk's statement to Martin that if he did not pay Ward the $35,000.00 requested, he "is not going to want to do a good job for you", "pulverized him, it demoralized him", R.R.,v.13,p.27, into involuntarily waiving his right to proceed with chosen counsel Mr. Ward. The trial judge's statement intimidated and coerced Martin into dismissing Mr. Ward as his chosen counsel a week later on September 27,2012. The trial judge's statement violated Martin's Federal and State right to choice of counsel requiring reversal of conviction and a new trial.

The Court should GRANT REHEARING & PDR on this issue since it is a novel and important issue of Texas and/or Federal constitutional law which this Court has not squarely addressed but this Court should address to inform the bench and bar as to the content of the law on the issue. Tex.R.App.P.66.3(b),(c); King,125 S.W.3d @ 520. Here, the Court of Appeals opinion presumably did not address this issue preserved only in a pro-se motion for rehearing. See Am.Mot.for Reh'g, 4-5,14-15(filed 7/17/14, "overruled" 7/24/14); Sotelo v. State,913 S.W.2d 507,508-10(Tex.Crim.App.1995)(claim was preserved though only presented on motion for rehearing as no earlier opportunity to raise claim); Rochelle,791 S.W.2d @ 124.

## D. Involuntary and Unknowing Rejection of 35 Year Plea Offer

Martin's being kept uninformed about Mr. Ward's fee contract's existence and terms for pre-trial negotiations only, up to the September 20,2012 motion to withdraw hearing, deprived him of effective assistance of counsel during the plea negotiations, prejudiced Martin by his rejecting 40 and 35 year plea offers, coercing him to proceed to jury trial with Mr. Boyd which led to three life sentences. Martin was pulverized and demoralized through the September 20,2012 hearing to begin with, after finding out Mr. Ward had concealed the contract's existence and terms from him, realizing his family did not have Ward's requested additional $35,000.00 to continue representation through trial, but still tried to force Ward to represent him in trial using attorney Boyd against Ward in the hearing and the trial judge's order to Ward. Judge Michalk's comment to Martin that "You have to pay your attorney. Otherwise your attorney is not going to want to do a good job for you" was the straw that broke Martin's will to proceed with Mr. Ward, renderring his choice of counsel in Mr. Ward unknowingly and involuntarily waived with the September 27,2012 motion to substitute Mr. Boyd for Mr. Ward. Compare, Powell,287 U.S. @ 53,57-59("[A] defendant should be afforded a fair opportunity to secure counsel of his own choice",period from arraignment to trial is "perhaps the most critical period of the proceedings"), with, Beets v. Scott,65 F3d 1258,1274(5th Cir,1995)(en banc)(counsel fee contract dispute hindering his performance authorizes relief for ineffective assistance of counsel). The Supreme Court case of Lafler v. Cooper,No.10-209,566 U.S.___(2012) was decided during Martin's trial, which held where counsel's ineffectiveness led to an offer's rejection, and where the prejudice alleged is having to stand trial, a defendant must show that but for counsel's ineffectiveness, there is a reasonable probablity

-10-

that the plea offer would have been presented to the court, that the court would have accepted it's terms and that the conviction or sentence or both, under the offer's terms would have been less severe than under the actual judgement and sentence imposed. Id.,Slip Op.,3-11. It appears that the present record supports an ineffective assistance of counsel holding and order to the State to reoffer the plea agreement of 35 years under Lafler, DESPITE the judge's comment to pay Mr. Ward or suffer Mr. Ward not wanting to do a good job for him in trial. Lafler,Slip Op. @ 14-16. Adding the trial judge's comments into the mix would seem to cement Martin's claim of an unknowing and involuntary rejection of the 35 year plea offer conviction reversals and a new trial.

The court should GRANT REHEARING & PDR on this issue based on the reasoning and law presented infra at Part C hereinabove. Tex.R.App.P.66.3(b),(c). See, Am.Mot.for Reh'g,4-5,15-16(filed 7/17/14, "overruled" 7/24/14).

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant Martin respectfully requests the Court GRANT rehearing and set the case for submission. Tex.R.App.P.79.4.

## CERTIFICATE OF SERVICE

I certify and affirm placing a true and correct copy of the foregoing Motion for Rehearing into the prison mailbox on 3/12/15, well in advance of the Court's current extended deadline of 3/17/15, and addressed to: Abel Acosta, Clerk, Court of Criminal Appeals, PO Box 12308, Austin, Tx.78711-2308; State Prosecuting Attorney, Price Daniel Sr..Bldg., 209 W.14th St., Rm.202, Austin, Tx. 78711; Attorney Jason Larman, Ass't DA, Montgomery County District Attorney's Office, 207 W. Phillips, 2nd Floor, Conroe, Tx.77301.

Respectfully Submitted,

*Peter James Martin*

Peter James Martin, #1846003, pro-se,
Stiles Unit, 3060 FM 3514
Beaumont, Tx.77705

-11-

No.14-1050-PD

---

## ATTACHMENTS IN SUPPORT OF APPELLANT'S PRO-SE MOTION FOR REHEARING FROM DENIAL OF PETITION FOR DISCRETIONARY REVIEW

---

1.  State's Ex.215-"Lieca Scan" drawing                                     1
2.  Texas Monthly May 2014 article,pgs.1-13                        2-1 to 2-13
3.  Receipts for original petition and appendix copying costs               3
4.  TDCJ-CID Notification to Come By Mail Room 11-4-14                       4
5.  TDCJ Correspondence/Contraband Denial Form 11-3-14/11-5-14              5
6.  Complain of 11-5-14 and response about unauthorized confiscation        6
7.  TDCJ Director's Review Committee decision to uphold the rejection
    of all legal documents on another offenderof 12-9-14                   7
8.  TDCJ Step 1 Grievance, refusing relief, 12-4-14                         8
9.  TDCJ Step 2 Grievance, refusing relief  01-6-15                         9
10. Motion for Extension of Time, granted 11-12-14              10-1 to 10-4
11. TCCA Notice Denying "Motion to Order State to Return
    Confiscated Documents to Appellant", 12-19-14                          11
12. TCCA Notice receiving and filing petition for discretionary review
    and Supplemental Brief and Motion for Leave to File Supp.Brief         12
13. TCCA Notice Extending Time to File PDR Until 01-2-15, dated 11-12-14    13
14. TCCA Notice denying motion to exceed the page limit, 1-23-15           14
15. TCCA Notice refusing petition for discretionary review, 2-4-15         15

Appellant Martins hereby declares under penalty of perjury that the above attachments are true and correct copies of the originals, in the record or already in possession of the State, based on his personal knowledge.
   EXECUTED ON 3-12-15                              VTCPRC §132.001 et seq.

*Peter James Martin*
Peter James Martin, #1846003, pro-se

MCSO

Drawn By
CSI M. W. Wright

Date Drawn
1/18/2013

Incident Date:
Location:

March 8, 2012
25478 Bates Splendora, Tx

Case Number
12A003458

Scale        Not to scale

△ Denotes Leica Scan Location

⇢ Denotes direction of travel 91 Chrysler

1) Fired Casing
2) Paint Chip
3) Fired Bullet
4) Fired Casing
5) Fired Casing
6) Metal Piece










*Visit* THE MAKING OF
GONE WITH THE WIND

# TexasMonthly

*Welcome to Texas Monthly*     SIGN IN

# Who Will Watch the Watchers?

IN AN INCREASINGLY MILITARIZED ZONE ALONG THE RIO GRANDE, THERE ARE MORE
BORDER PATROL AGENTS ON THE GROUND THAN EVER BEFORE, AND MORE VIOLENT
CLASHES BETWEEN AGENTS AND MEXICAN CITIZENS. WHICH RAISES A
FUNDAMENTAL CONCERN: WHO WILL WATCH THE WATCHERS?

*by* NATE BLAKESLEE      MAY 2014





A frame from the video of Guillermo Arévalo Pedraza's shooting, on September 3, 2012.

2-1

The video begins with an establishing shot of sorts: A Mexican flag dangles from a flimsy pole—a fishing rod, maybe—that somebody has stuck in the dirt in the foreground. Beyond we see the back of a man in a yellow shirt standing on the gently sloping bank of a river that is just catching the last of the late-afternoon light. He is standing perfectly still, watching a boat perhaps 150 feet away from him, near the steep, carrizo-covered opposite bank. It's an eighteen-foot aluminum airboat with a low deck and an enormous motorized fan on the rear that emits a deafening roar. The camera zooms in on the boat, which is pointed upstream, holding its position against the considerable current. The light is not great, and neither is the focus, but we can just make out the white shirtsleeves of the driver, and perhaps the outline of another man seated on a small bench in the front of the boat, along with the familiar green stripe of the U.S. Border Patrol on the boat's silver profile.

We hear an unseen woman's voice—the filmmaker—rising above the drone. "He is taking aim, right? At them?" she says in Spanish. There is a muttered reply from nearby. The camera pans left, and we are now looking out from behind the windshield of a parked truck—our videographer has been sitting in the front seat all along, filming through the open window on the passenger side. Now we can see people on the riverbank having a barbecue: A middle-aged man in a yellow baseball cap and long white shorts is leaning idly against a white Buick sedan. A skinny young man in a muscle T squats at the man's feet, while another stands nearby. A woman sits on the hood of the car, looking placidly down at the river. A girl, maybe ten, in an orange tank top ducks into one of the Buick's rear doors, reaching for something, while another, slightly younger, walks away from the car, swinging her arms back like she is getting ready to skip, or perhaps execute a standing broad jump.

There are dragonflies in the air, and everyone is moving in that lazy way you do on a summer evening, after the food and the beer are mostly gone but the lingering sun keeps people from going home. It would be a pleasant scene but for the steady roar of the airboat. The man in the yellow hat, who has only a few more minutes to live, turns to greet someone who has just walked up. "*Ya quítala*," we hear the filmmaker's companion say. "Turn it off."

When the camera comes back on, everything is different. Instead of the steady drone, the airboat's motor is revving wildly. Suddenly our filmmaker leaps out of the truck and runs toward the water, the camera pointed down at the gravel beach and bouncing wildly with each step. It sounds like we are at a NASCAR race now, the boat has gotten so loud, yet the camera stays pointed down, maddeningly averted from whatever commotion is drawing us to the river. Just as we pass a white plastic picnic table with a blue cooler next to it, we hear the shots: seven of them in quick succession, each one

2-2

sounding on the camera's cheap microphone like the *ka-chunk* of a heavy-duty stapler. The gunfire makes our filmmaker stop, finally, and bring the camera up before her.

We see the aftermath. Down by the river there are a dozen or more people screaming and crying. The man in the yellow ball cap is lying on his back about ten feet from the water. A woman stoops over him, wailing. "That's against the law! That's against the law!" someone can be heard screaming in English. The boat circles once and seems to stop at the far bank momentarily, before speeding away upstream.

**The man in the video** was a 37-year-old bricklayer named Guillermo Arévalo Pedraza. He was shot in Nuevo Laredo on September 3, 2012, during a visit to the river with his wife, Nora Lam Gallegos; their two daughters, Mariana, who was nine, and Priscilla, who was ten; and several friends. The shooting took place in a popular park called El Patinadero, where families come on weekends to swim, fish, and relax at the barbecue pits and picnic tables. Arévalo's wife and daughters all had late-summer birthdays, and Arévalo had cooked a carne asada as a kind of collective celebration. It was a Monday night, and the park was not crowded, though several other families, some with children, were picnicking nearby. The Border Patrol airboat appeared after Arévalo and his family had eaten and the party was winding down. Interviews conducted by the Tamaulipas state police and depositions collected from witnesses by Lam's American attorney all tell the same story about what happened next, during the missing portion of the video. Shortly after the boat appeared, a young man jumped out of the carrizo on the Texas side of the river, plunged into the water, and began swimming toward the park. Before he could make it, though, the airboat circled him in midstream, while an officer in a black face mask tried unsuccessfully to grab him.

A small crowd soon formed by the side of the river, as people in the park became aware of the chase. They began shouting at the agents to stop circling the swimmer, who by now had been in the water fighting both the current and the boat's heavy wake for some time. The beach was strewn with small rocks, and one witness reported that one or two men—though not Arévalo—threw rocks at the boat but failed to connect, because the boat was too far away. (Five other witnesses reported that no rocks were thrown.) Eventually the swimmer managed to get past the boat. Just as he was about to reach the safety of Mexican soil, the masked officer in the front of the boat suddenly dropped to one knee and fired his assault rifle at the crowd, hitting Arévalo in the thigh and the chest. "They killed him! They killed him!" his wife screamed in Spanish. His younger daughter, Mariana, had been standing next to him when he was shot, and she was in all likelihood the only person who reached him before he died. She hugged him as he lay on his back, bleeding. She was so covered with blood herself, her mother said later, that she looked like she too had been shot, as she easily could have been.

2-3

Among the witnesses at the park that evening was an American named Veronica Martinez, who worked as a nurse in Laredo but kept a home in Nuevo Laredo as well. Knowing she was an American, friends urged her to cross the bridge immediately and report what she had seen. There was no doubt in her mind, Martinez said later, that what she had witnessed was a completely unprovoked killing. Her boyfriend drove her to the nearest bridge, where she bypassed the line of pedestrians waiting to cross over and demanded to speak to someone in charge. She was interviewed by a Border Patrol supervisor and an FBI agent in a small room on the American side of the bridge. The next day, the Border Patrol issued a statement announcing only that agents in an airboat had been attacked with rocks and had used their weapons to defend themselves. There was no mention of the fatality or the victim, and the agents were not named. Newspapers and TV stations in both Laredo and Nuevo Laredo reported on the shooting on September 6, and Arévalo's widow told reporters that the Border Patrol had killed her husband, a claim that the agency would not verify.

The incident would likely have remained in the shadows, except that the next day the video described above—which had been made by an anonymous bystander—found its way into the hands of producers at a news organization called RN Noticias, in Nuevo Laredo. Soon after, the station posted it on YouTube, and everybody in Laredo and Nuevo Laredo could see the tragedy, or at least its aftermath, in living color. Television news all over Mexico picked up the story, and the video was shown again and again.

In Mexico, alleged Border Patrol malfeasance is a popular genre on YouTube, and there are plenty of videos that purport to show human rights violations. In this case, however, the shocking abruptness of the violence and the immediacy of the grief on display gave the video a singular impact. A few days after it was posted, a Mexican senator denounced the shooting on the floor of the Mexican congress and called for a full investigation. On September 11, Mexican president Felipe Calderón brought up the incident during a visit to the offices of the *Wall Street Journal*, in New York, where he sat down with the editorial board for a wide-ranging interview. "This father was not trying to cross the border, he was trying to pass a good day with his kids," Calderón told the board, adding that this was only one of several recent shootings of Mexicans by U.S. agents. The *Journal* was careful not to condemn these shootings but did offer an interesting observation about how such events are perceived in the United States. Everybody had heard of Brian Terry, the Border Patrol agent whose 2010 murder had become entangled in the botched "Fast and Furious" gun-running sting, the *Journal* opined. But who has heard of Guillermo Arévalo Pedraza?

Over a year and a half later, the answer to that question, at least in this country, is still "almost nobody." The Border Patrol has released no official report on the incident, not even so much as the name of the shooter. Nor has there been any official announcement by federal investigators. Contacted for this story in late March, an FBI spokesperson would say only that the agency had

2-4

completed its investigation and turned its findings over to the Civil Rights Division of the Department of Justice. In recent months, however, the Border Patrol's use of force has come under heightened scrutiny both in Congress and in the national media, casting a new light on Arévalo's shooting and others like it. Border security, meanwhile, has once again become a buzzword in Washington, as a new immigration reform bill wends its way through Congress. As some in Washington call for more agents in the field as a prerequisite to negotiation on any comprehensive reform measure, Arévalo's case poses a troubling question: While agents watch the border, who is watching them?

**Border patrol shootings, especially** those that involve agents shooting across the border into Mexico, used to be quite rare. Such incidents have become more common, however. Since the beginning of 2005, Customs and Border Protection officers, who work at ports of entry, and Border Patrol agents, who police the vast areas between ports, have killed at least 42 people. Some of these shootings were clearly justified, but in many instances, as in Arévalo's case, accounts offered by agents and eyewitnesses differ. The best known of these incidents was the June 2010 shooting of a fifteen-year-old Mexican boy under a railroad trestle connecting El Paso and Juárez. Sergio Adrián Hernández Güereca was among a group of boys and men who had crossed the mostly dry, concrete-covered bed of the Rio Grande, only to be surprised by a Border Patrol agent on a bicycle. A cellphone video shot from the sidewalk on the nearby international bridge captured what happened next. In the video, the agent manages to collar one of the fleeing young men, and then, holding his captive down with one hand, he points his pistol across the river and fires. A figure falls dead, shot in the head.

The agent, Jesus Mesa Jr., would later tell investigators he was surrounded by rock throwers and fired in self-defense. Yet the video, which has now been viewed more than 1.6 million times on YouTube, clearly shows that Mesa was not surrounded. And while it seems to show more than one person throwing rocks at the agent, Hernández himself, who was hiding near one of the trestle's pilings, was not among them. Federal investigators declined to prosecute Mesa for the shooting, finding that he had followed agency policy.

Far fewer people have viewed the video of Arévalo's killing, though both incidents raise the same essential questions about how lethal force is being used along the border, especially with respect to incidents of alleged rock-throwing attacks on agents. Border Patrol agents and CBP officers both work for an agency called Customs and Border Protection, which is a division of the Department of Homeland Security. Official CBP policy allows agents to use lethal force when they feel their lives are in danger, and while the agency for years has declined to make public the details of this policy, senior officials have long maintained that the agency considers rock-throwing attacks (or "rockings," as agents refer to the incidents) to be potentially life-threatening situations. Rockings can be dangerous, T.J. Bonner, the former president of the National Border Patrol Council, the union that

represents agents, told *Homeland Security Today* magazine in 2011, not just because of the damage a thrown rock could cause but also because of what could happen after an agent was incapacitated by a rock. "What's to stop one of these people," he said, "from then taking the agent's firearm and executing him?"

Statistically speaking, Border Patrol agents are much less likely to be physically assaulted than municipal police officers in an average city. Killings of agents are rare, though not unheard of; three agents have been killed by assailants since 2004. There is no question that rockings have become common, however, due in part to the sheer number of agents that are now on the border. In the post-9/11 era, a renewed focus on border security led to a doubling of the force (there are now roughly 21,000 Border Patrol agents, along with nearly 22,000 CBP officers working the ports of entry). Smuggling of both people and contraband has become more difficult as a result of the massive increase in personnel, and rock-throwing has become a favored means of distracting agents trying to make arrests. This is especially true in urban areas, where smugglers and agents are ubiquitous. Sometimes the rock throwers are lookouts, hired to buy their employers a few extra seconds to get back into Mexico. Other times they are simply bystanders who express their displeasure with *la migra* with whatever means they can find at hand.

No agent has ever been killed by a rock, and injuries are infrequent, usually because of the distance between agents and their assailants. The vast majority of these attacks do not result in agents' firing their weapons. Still, it's clear that agents are using their weapons with some regularity. According to numbers compiled by the inspector general's office of the Department of Homeland Security, agents were attacked with rocks 185 times in 2012, the most recent year for which figures are available, and responded with firearms in 22 of those instances. In a year-long investigation of CBP shootings published in December, the *Arizona Republic* found 8 instances in which agents had killed rock throwers since 2010. Using agency records, the *Republic* also tabulated 160 incidents during that period in which agents chose to use less-lethal weapons at their disposal, including a type of military-grade paintball gun that can shoot more than ten pepper spray–filled balls per second. There were no reported injuries—among agents or assailants—in those instances, and agents consistently reported that these weapons were quite effective in deterring rock throwers. Yet agents are not required to carry them, even in urban areas, where most rockings occur.

Under pressure from members of Congress concerned about the rash of recent shootings, in 2012 CBP officials quietly invited a group of law enforcement experts to review the agency's use-of-force policy. The group, known as the Police Executive Research Forum, was given access to several years' worth of internal CBP use-of-force incident reports. The CBP did not release the results of that review to the public, but some of its recommendations were leaked. The Associated Press reported last November that among other things, PERF advised against using lethal force on rock throwers. A

better policy would be to move out of range or use less-lethal weapons, PERF concluded. In response to questions from the Associated Press, however, Border Patrol chief Michael Fisher announced that his officers would continue to employ deadly force against rock throwers at their own discretion, despite the experts' recommendation. This prompted a round of stories with unfortunate headlines like "Border Patrol Will Continue Killing People Who Throw Rocks." The agency seemed oblivious to the public relations implications, or perhaps impervious to them.

That changed in late February of this year, when the *Los Angeles Times* acquired an unredacted version of the PERF report. According to the *Times*, the report determined that "some border agents stood in front of moving vehicles as a pretext to open fire and that agents could have moved away from rock throwers instead of shooting at them." The report also suggested that some agents fired their weapons at rock throwers out of frustration, not a sense of endangerment. Finally, it cited a "lack of diligence" on the part of CBP officials assigned to investigate agent-involved shootings. Asked about the report, Jeh Johnson, Barack Obama's new Secretary of Homeland Security, replied that the agency was rethinking its recalcitrant response to PERF's recommendations.

Then, in early March, Chief Fisher announced official changes to the Border Patrol's use-of-force policy. Agents would now be prohibited from stepping in front of moving cars or shooting at vehicles fleeing from agents and would be instructed to move away from rock throwers or take cover if possible. This was widely described as a "reversal" of previous policy, but it remains far from clear what practical effect it will have on the ground. After all, the existing use-of-force policy, which CBP finally made public around the same time, also directed agents to use lethal force only when they felt themselves to be in imminent danger. Indeed, officials with the National Border Patrol Council immediately downplayed the significance of the announcement, which Chief Fisher himself had referred to not as a new policy but as a clarification of existing policy.

"We don't view it as an outright restriction on agents' use of deadly force," Shawn Moran, the vice president of the agents' union, told the *Arizona Republic* on the same day Fisher made his announcement. Moran characterized it as "a reminder to agents to seek alternatives." In other words, agents will still exercise their own discretion in deciding when to shoot at rock throwers. And the new directives have yet to be incorporated into an official update of the use-of-force handbook, a process that is typically the result of a protracted negotiation with the union, which relies on the handbook in defending agents subject to disciplinary actions. "We would fight any restrictions on the ability of agents to use force to defend themselves," Moran told the *Republic*.

Whether or not agents will be held accountable for the decisions they make remains unclear as well. Neither Chief Fisher nor Secretary Johnson has publicly responded to one of the key findings in the PERF report, concerning CBP's "lack of diligence" when it comes to internal investigations. The

*Arizona Republic*'s investigation examined the 42 lethal shootings since 2005, and in not one of those cases could the paper determine that any agent involved had ever been disciplined by any agency, charged criminally, or found civilly liable. The silence surrounding the investigation of Guillermo Arévalo Pedraza's death is not the exception, it's the rule.

**"Affairs on the border cannot** be judged by standards that hold elsewhere," Walter Prescott Webb wrote in *The Texas Rangers,* his 1935 treatise on the state's elite police force, which was for all practical purposes the frontier's nineteenth-century version of the Border Patrol. Almost eighty years later, the modern Border Patrol still seems to operate in a kind of moral and ontological gray area, one that extends to even the most basic question of just what a Border Patrol agent is. An agent is not technically a soldier, though casual observers could be forgiven for thinking otherwise. Not only have the accoutrements of war become increasingly common on the border, as the CBP uses drones and Black Hawk helicopters to patrol the more remote areas, but the rhetoric of war is pervasive in the media and on Capitol Hill. In 2010 Oliver North took his Fox News *War Stories* team to the border to report on what he called the "Third Front" (the other two being Iraq and Afghanistan). The National Geographic Channel reality show *Border Wars,* which follows Border Patrol agents in the field in the tradition of *Cops,* is now in its eighth season. Meanwhile, the violent conflict in recent years between warring cartels in northern Mexico has given rise to the "spillover violence" meme, which has been ubiquitous in policy circles and media reports since 2008. Security hawks in Congress argue that the Border Patrol—only recently doubled in size—needs reinforcements to protect us from this phenomenon, despite the fact that the Southwest border remains among the safest places to live in the United States. (El Paso, despite its proximity to Juárez, one of the most dangerous places in the western hemisphere, is the safest large city in America.)

Policymakers and senior officials at the agency seem torn about whether the Border Patrol is an army or an enormous police force. The seeds of this identity confusion were planted shortly after 9/11, when the Border Patrol was subsumed under the newly created Department of Homeland Security and recast as one of many regiments in the nation's war on terrorism. The Border Patrol's new mission was said to be aligned with that of the Army or the Navy or the NSA: to protect us from foreign invaders bent on our destruction. But while having 21,000 agents on or near the border no doubt has dissuaded some foreign elements from entering the country overland, fighting terror is not principally what those agents do. The Border Patrol arrested 364,000 people in 2012. Not a single one was an international terrorist. The vast majority were migrants in search of jobs. An agent spends most of his or her time chasing would-be nannies, construction workers, and landscapers. Even the drug mules, *los mochileros,* are not generally armed or dangerous.

The difference between a soldier and a police officer is more than a semantic one, and the Border Patrol's identity crisis has genuine consequences. War and police work are fundamentally dissimilar,

explains Christopher Wilson, a border-security expert at the Woodrow Wilson International Center for Scholars, a Washington, D.C., think tank. "When you're told your mission is national security, and the people you're interacting with are not citizens—meaning they're not the people you're accountable to in a democratic structure—that does replicate to a certain extent the situation the military faces," he said. "Nonetheless, they are law enforcement. And what that means is you use the minimal force needed to do your job."

Police forces are also more transparent and receptive to criticism from the communities they serve than armies. The community the Border Patrol operates within may be an unusual one, in that it straddles an international boundary, but it is a community nonetheless. The ties—family, cultural, and commercial—that bind twinned border towns like Laredo and Nuevo Laredo are hundreds of years old. Yet the metaphor of war has, perhaps unintentionally, helped give the CBP a certain measure of insulation from that community. Extracting information from the agency about a shooting is notoriously difficult, especially when compared with a typical urban police department. If an officer kills someone in Dallas, for example, the name of the officer involved is typically released the same day, and residents of Dallas can expect to see a statement describing what happened from the chief of police in the paper or on the evening news. Internal investigations follow a standard operating procedure that is reasonably transparent. The result is that while community members may not always agree with decisions made about the legitimacy of police shootings, the process at least offers some reassurance that officers are accountable to the community they serve.

The Border Patrol, by contrast, almost never releases the names of agents involved in shootings or the results of internal investigations. Typically, such details become public only if a civil suit is filed and a judge grants the attorney for a victim's family access to the relevant information. Information about shootings is very hard for the media to acquire as well. In its investigation, the *Arizona Republic* noted that it took nearly a year for the agency to release the use-of-force reports the paper requested, and they were frequently heavily redacted or incomplete.

Members of Congress, even those whose duties include oversight of CBP, have the same difficulties when it comes to getting information from the agency, according to El Paso congressman Beto O'Rourke, a Democrat who sits on the Homeland Security Committee. "The top officials cloak themselves in the national security mantle," he said. "We can't get any more information than anybody else about specific incidents."

With such an opaque internal disciplinary process, victims' families often find that their only recourse is through the courts. But this is frequently less than satisfying too. A Corpus Christi trial lawyer named Bob Hilliard represents the families of both Sergio Hernández and Guillermo Arévalo. "Hernández was not throwing rocks. And I don't think Arévalo was either," he said. "But what if

they were? Would a Laredo police officer shoot somebody dead for throwing a rock at him from a hundred feet away?"

Hilliard's wrongful-death suit on behalf of Hernández was dismissed by an El Paso judge in August 2011 on the grounds that the victim was not killed in the United States and therefore not entitled to relief under the U.S. Constitution. "If I understand that correctly, it means any agent can do anything he wants to anybody as long as the victim is in Mexico and the agent is on U.S. soil," Hilliard said. "Does that sound right to you?" Hilliard has appealed the ruling. His suit on behalf of Arévalo has yet to be filed.

Whether criminal charges will be brought against Arévalo's shooter is still an open question. For federal prosecutors, when it comes to filing charges against Border Patrol agents, there is more to consider than just the facts of the case. The appointment of U.S. attorneys, after all, is overseen by the president, and, rightly or wrongly, they are seen as his agents, which means such prosecutions inevitably become entangled in the seemingly endless debate over immigration reform. Consider the notorious case of Border Patrol agents Ignacio Ramos and José Compeán, who were tried and convicted in 2006 for shooting a fleeing, unarmed smuggler. The smuggler survived and escaped to Mexico, where his account of the shooting led to the agents' eventual prosecution. Investigators discovered that the agents, knowing they had committed a crime, covered up the episode by destroying evidence and lying about the incident. Nevertheless, the reaction to their sentencing, especially on conservative talk radio, was so vehement that then-president George W. Bush was persuaded to commute their sentences as one of his last acts in office. How could we be going after agents, it was argued, when officials in Washington had done so little to stem the flow of illegal immigrants and narcotics?

It did not help, of course, that the victim in that case was a smuggler, a fact that is not lost on federal officials in Hernández's case either. Three days after the teenager's death, authorities leaked his arrest record to the press. At a time when we still did not know the name of the shooter, we knew that Hernández was a *patero*, a smuggler who helps people cross the border. He had been arrested for allegedly helping people illegally cross more than once, most recently in 2009. (He was never prosecuted, probably because he was a minor.) Leaking Hernández's record was a violation of federal law—juvenile records must be kept private—but the agency was facing a public relations disaster. When asked about Hernández's record on Fox News, Hilliard replied with a question of his own: "And punishment for [smuggling] is for the Border Patrol agent to be judge, jury, and executioner there on the border?"

No smears have been forthcoming about Arévalo, whose name does not appear in CBP's database of offenders. Still, Hilliard said he is not optimistic about a criminal prosecution. Border security is still

2-10

a top issue, especially for Republican primary voters, which means it remains a political football. He thinks U.S. attorneys learned a lesson from the Ramos and Compeán prosecution. "It's just not worth the hailstorm that will follow," he said.

To date, neither the House nor the Senate Homeland Security committees have scheduled hearings on CBP's use-of-force policies, though incoming CBP commissioner Gil Kerlikowske, a former Seattle police chief, was asked about the issue at his confirmation hearing in January. He promised more openness if confirmed, noting that he had never worked for a police department that did not make its use-of-force policies public. O'Rourke, the El Paso congressman, has teamed up with a conservative New Mexico Republican named Steve Pearce on a proposal to create a new border oversight commission, to bring some transparency to the agency's activities. The bill would also create a new ombudsman within the Department of Homeland Security, to bring an independent set of eyes to bear on allegations of wrongdoing, not unlike the approach used by the U.S. military to address the recent sexual abuse scandals. O'Rourke has found some tea party members to be surprisingly receptive to his reform message. "They don't like the idea of the border as a kind of Constitution-free zone, where civil liberties and constitutional protections don't apply," he said.

**Nora Lam Gallegos lives** in a neighborhood on the northern outskirts of Nuevo Laredo called Lomas del Rio, one of the neatly gridded developments of modest concrete and cinder-block homes that have sprung up in the twenty years since the passage of NAFTA made this city a boomtown. On the February morning I visited, it was bitterly cold and overcast, and nobody was out on the street. I recognized the cheerful green exterior of Lam's house from earlier reports on Mexican TV news, though it had lost much of its charm in the intervening months. Lam told me she had been able to find only sporadic employment since her husband's death, including some part-time housecleaning. It was not enough to replace her husband's income. The girls were not at home, but the hallmarks of female adolescence were hard to miss. On a shelf in the living room was a homemade Mother's Day card, along with some Hello Kitty wonderama. Her daughters hadn't been the same since seeing their father killed, she said. "They were never rebellious before," she told me in Spanish, "but now they don't want to listen." The Tamaulipas state government paid for the kids to see a psychologist, which was helping, she said. The park where her husband was shot—part of a larger complex that includes a zoo, a skate park, and a swimming pool—had long been one of their favorite places to visit. "They are always asking me to go back," she said, tearing up. "I take them, but not down to the river. I can't do it."

Lam, who is 28, would have celebrated her eleventh anniversary with Arévalo this year. They met at the wedding of a friend, and he made her laugh. He was a constant presence in the neighborhood, she said, playing soccer with the local kids or chatting at the fence with the neighbors. But mostly he lived for his daughters. After his death, Arévalo's friends paid to have a *corrido* written about him,

and the accompanying YouTube video is filled with still photos of Arévalo with Priscilla and Mariana, the girls mugging for the camera with a treat in one hand and an arm around their dad, who sports a goatee and a seemingly endless variety of major league baseball caps. Many of them were taken at El Patinadero, not far from the spot on the bank where he died.

Lam was interviewed by American officials in Laredo two days after the shooting, but she has not heard from anyone about the investigation in a long time. On the morning I visited her, the *Laredo Morning Times* carried a story about the sentencing of a Mexican gunman for the murder of Border Patrol agent Brian Terry. Terry's killer, apparently a bandit who preyed on backcountry drug couriers, got a thirty-year sentence. I showed the clipping to Lam. "They made that Mexican pay for what he did," she said. "And if my husband had been the shooter, instead of the one who got shot, you can be sure the Mexican government would have given him to the Americans, and he would have been punished." But it didn't happen that way. To this day, she still doesn't even know the name of her husband's assailant. "How come he is free and enjoying life," she asked, "when there is no happiness in mine?"

After I visited Lam, I went to the park where her husband died. The shocking images I'd seen in the video were hard to square with the scene itself. I stood in the parking lot of the zoo on the hill above the park and looked down at the acre of trees, their trunks painted white to ward off bugs, and the river beyond. A quarter mile up the opposite bank, in Laredo, sat a nice new H-E-B, its cobalt-blue-framed entrances beckoning cheerfully, its parking lot about a quarter full. Between the blacktop surrounding the store and the river below was a maze of bare-earth paths trickling down through mesquite and thick brush, beckoning the *mochileros* and *pateros* to take their chances. A white Border Patrol SUV was parked at a strategic point halfway down the bank, looking over the river and the park on the far side. It's a favorite lookout point; if you study the satellite image of the park right now on Google Maps, you'll see the same SUV, or one just like it. It's a hell of a place to get shot in the chest with an automatic weapon, between an H-E-B and a zoo.

I drove down to the river, where I was joined by Josué Ledezma, a close friend of Arévalo's who was at the barbecue the day of the shooting. Ledezma is also a bricklayer by trade, though he is ten years younger than Arévalo, lean and handsome. He grew up in Lomas del Rio, and he and Memo, as Arévalo's friends called him, had been close since Ledezma was a boy. In the video, he is one of the young men who can be seen near Arévalo as he leans against the white Buick, in the calm before the storm.

Like everyone else in the city, Ledezma seemed to have been caught off guard by the freakishly cold weather. He was wearing pajama bottoms and a long-sleeved T-shirt, shivering as he walked me through the scene of the shooting. With his hands tucked snugly under his armpits, he showed me

2-12

where he was standing when his friend was shot and how the bullets kicked up the gravel all around his feet. It was a miracle, he said, that only one person had been shot. He had dived into the brush when the shots were fired, and when he came out, he saw Arévalo lying on the ground. It was Ledezma who drove Arévalo to the hospital in his dying friend's own Buick, along with his wife and daughters.

Ledezma said he had been contacted as recently as last fall about the shooting by American investigators and had told his story once again. After so much time had passed, however, he wasn't optimistic that justice would be coming for his old friend. On the bank not far from where Arévalo died, there is a large square of concrete, the remnant of an old bridge or pipeline foundation, partially submerged in the river. In the days after his death, Arévalo's wife had spray-painted a simple memorial there for her husband. It had read *"Descansa en paz, El Memo."* Ledezma looked for it, but he couldn't find it. It was definitely the same spot, but the words weren't there anymore.

*"Se desvanecieron,"* he finally said. "They faded away."

Tags: POLITICS, BORDER PATROL, BORDER VIOLENCE, ROCK THROWINGS, GUILLERMO ARéVALO PEDRAZA, CUSTOMS AND BORDER PROTECTION, LAREDO, NUEVO LAREDO



## MORE TEXAS MONTHLY

Loading, please wait...

## Fulton PRINTING

P.O. Box ~~~~ ● 105 E. Tyler St.
Athens, Texas 75751 (903) 675-7636

| Customer's Order No. | | | | Date 10/28/14 | 19 | |
|---|---|---|---|---|---|---|
| Name | | | | | | |
| Address | | | | | | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT | MDSE RET'D | PAID OUT | |
|---|---|---|---|---|---|---|---|

| QUAN | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 436 | B & W Copies | .10 | 43.60 |
| 158 | Gloss / Color | .65 | 102.70 |
| | **PAID** | | |
| | CK# 2839 | | |
| | TAX | | |
| | TOTAL | | 146.30 |

All claims and returned goods MUST be accompanied by this bill.

9260    Rec'd by

---

## Fulton PRINTING

P.O. Box 2021 ● 105 E. Tyler St.
Athens, Texas 75751 (903) 675-7636

| Customer's Order No. | | | | Date 10-6-14 | | |
|---|---|---|---|---|---|---|
| Name | | | | | | |
| Address | | | | | | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT | MDSE RET'D | PAID OUT | |
|---|---|---|---|---|---|---|---|

| QUAN | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | Copies | | 54.00 |
| | **PAID** | | |
| | TAX | | |
| | TOTAL | | 54.00 |

All claims and returned goods MUST be accompanied by this bill.

9247    Rec'd by

---



## Fulton PRINTING

P.O. Box ~~~~ ● 105 E. Tyler St.
Athens, Texas 75751 (903) 675-7636

| Customer's Order No. | | | | Date 9-23-14 | | |
|---|---|---|---|---|---|---|
| Name | | | | | | |
| Address | | | | | | |

| SOLD BY | CASH | C.O.D. | CHARGE | ON ACCT | MDSE RET'D | PAID OUT | |
|---|---|---|---|---|---|---|---|

| QUAN | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| 20 | Color Copies | .65 | 27.50 |
| 48 | B & W Copies | .15 | 7.20 |
| | **PAID** | | |
| | CK# 3835 | | |
| | TAX | | |
| | TOTAL | | 34.70 |

All claims and returned goods MUST be accompanied by this bill.

9237    Rec'd by

3

3C-25

# NOTIFICATION TO COME BY MAIL ROOM

Att _____ UNIT

Inmate Name Koumjian, Paul Date 11-4-14

Inmate No. 1039181

The above named inmate is required to come to the mail room
730-8:00
(Date and Time) 11-5-14

regarding the following matter:

_____ Questionable Correspondence
_____ Questionable Publication
_____ Package
__✓__ Legal, Special, or Media Correspondence
_____ Other

Inmate's Signature _____ Date _____

Notifying
Officer's Signature _____
Original—Return to unit mail room.
Copy—Give completed copy to inmate.

☆I-152 (NRD)

6

4

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRESPONDENCE / CONTRABAND DENIAL FORM

3C 25

NAME Koumjian, Paul J.

TDCJ-CID# 1039181

UNIT AH

DATE CORRESPONDENCE RECEIVED 11-3-14

DATE OFFENDER NOTIFED 11-5-14

**CORRESPONDENCE:** ☐ TO OR ☒ FROM  Kay Whititt
7260 CR 4710
Larue, Tx
75770

The above correspondence has been denied to you in accordance with BP-03.91, Uniform Offender Correspondence Rules

CHECK APPROPRIATE CAUSE OR CAUSES FOR DENIAL AND STATE APPROPRIATE REASON

☒ Content    ☐ Contraband    ☐ Enclosure    ☐ Package / Publication    ☐ Sealed Correspondence

DENIED: All legal documents on another offender

RECEIVED: ☒

**APPEAL:**
Should the offender decide to appeal the rejection of said correspondence/contraband, he/she must notify the Unit Mailroom **WITHIN TWO (2) WEEKS** of offender notification requesting that this correspondence/contraband and the rejection form be forwarded to the Director's Review Committee (DRC). Should persons outside the institution desire to appeal, submit by mail to the Director's Review Committee, PO Box 99, Huntsville, TX 77342-0099. The appeal must reach the DRC **WITHIN TWO (2) WEEKS** of the notification date listed above.

Does offender wish to appeal the decision? ☒ Yes ☐ No ☐ Non-Appealable ___Paul J. Koumjian 11-15-14___
Offender Signature          Date

**DISPOSITION:** Offender must check the desired disposition at the time the denial is presented.

☐ Destroy

☐ Send to the following person at the offender's expense: _Please let me know postage amount_
Name and Address
_to return to sender._

_____          _____ 11--14
Offender Signature & Date              Mailroom Representative Signature & Date

**UNIT DISPOSITION:** _____

Date          Employee's Signature

**IF A DISPOSITION CHOICE IS NOT EXPRESSED AND EXECUTED OR LITIGATION HAS NOT BEGUN ON ITEMS BEING HELD FOR LITIGATION WITHIN SIXTY (60) DAYS OF THE INITIAL DENIAL OR FROM THE DRC DECISION DATE (IF APPEALED), THE ITEMS WILL BE DESTROYED.**

**DISTRIBUTION:**
Original- Send to the DRC **IF THE OFFENDER WISHES TO APPEAL.** If not, keep on unit.
Gold  - Unit Copy
Yellow - Offender Copy
Pink  - Mail to sender/addressee of correspondence
I-153 (Rev. 3/12)

5

NOVEMBER 5th, 2014

TO: HUGHES UNIT MAILROOM SPERVISOR, ABEL ACOSTA CLERK OF TEXAS COURT OF CRIMINAL APPEALS, BEAUMONT NINTH COURT OF PPEALS

FR: PAUL JAMES KOUMJIAN, #1039181, HUGHES UNIT, UNASSIGNED

RE: UNAUTHROZED CONFISCATION OF LEGAL DOCUMENTS FROM OUT OF THE U.S. MAIL

Dear Hughes Unit Mailroom Supervisor,

On or about November 3rd, 2014 your office received from Kay Whitsitt, of 7260 CR 4710, Larue, Texas 75770, a package contining "legal documents" for deliery to me. Your office confiscated this legal material because "All legal documents on another offender" is what the I-153 stated. The other offender is Peter James Martin, TDCJ # 1846003 for whom I possess legal limited power of attorney authorizing me "to file and legal documents on [his] behalf, in any court action related to [his] convictions in Montgomery County cause number 12-03-02604-CR." See attached document, notarized by Anthony M. Holmes on September 23, 2014. The legal documents the mailroom confiscated are to be filed in Mr. Martin's pending direct appeal regarding that specific trial court number, pending in the Texas Court of Criminal Appeals under their case number of PD-1050-14 which is to shortly review Mr. Martin's convictions in Montgomery County cause number 12-03-02604-CR. Your office's confiscation of these materials from me I am legally authorized to possess and mail to and from the courts and private persons, will prevent Mr. Martin from filing his legal documents by the December 20, 2014 deadline for filing in his case. Please do not allow yourself or your office to be responsible for preventing Mr. Martin from exercising his legal, court sanctioned rights to have me file documents on his behalf in his criminal appeals, as the Beaumont Court of Appeals and the Texas Court of Criminal Appeals has been allowing me with express permission to do since early in 2014 on the record.

Please return the confiscated legal documents to me as soon as possible. Or alternatively, allow Ms. Kay Whitsitt to personally come to AH to pick up this confiscated materials and I will make other arrangements to get Mr. Martin's legal documents filed for him.

Thank you for your assistance and co-operation in this matter.

*You may be able to assist him but you cant have an outside source (3rd party) mail things to you that aint yours*

Sincerely

Paul James Koumjian

*L. Haught*

cc: Abel Acosta, Clerk,
Texas Court of Criminal Appeals
P.O. Box 12308, Capitol Station,
Austin, Texas 78711-2308

Carol Anne Barley, Clerk,
Ninth Court of Appeals for Texas,
1001 Pearl Street
Beaumont, texas 77701

6

# TEXAS DEPARTMENT OF CRIMINAL JUSTICE
## CORRECTIONAL INSTITUTIONS DIVISION

## DIRECTOR'S REVIEW COMMITTEE
## DECISION FORM

Offender:   KOUMJIAN, Paul          TDCJ-ID#:   1039181

Unit:   AH   042          Date:   12/09/14

The Director's Review Committee (DRC) has rendered a decision regarding your appeal of the Unit rejection of all legal documents on another offender received in contradiction with BP-03.91, Uniform Offender Correspondence Rules.

The return address indicates that the rejected item(s) was/were mailed to you from:

Kay Whitsitt
7260 CR 4710
Larue, Tx 75770

It is the decision of the DRC to **uphold** the Unit rejection of the above mentioned item(s). You will have 60 days from the above date to make disposition of the denied item unless security mandates there be no disposition.

DRC/

copy:   Unit Mailroom
Kay Whitsitt
file

7

# Texas Department of Criminal Justice

## STEP 1

## OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
|---|
| Grievance #: 2015046141 |
| Date Received: 11-19-14 |
| Date Due: 12-29-14 |
| Grievance Code: 307 |
| Investigator ID #: 76774 |
| Extension Date: None |
| Date Retd to Offender: DEC 04 2014 |

Offender Name: Paul James Koumjian  TDCJ # 1039181

Unit: AH  Housing Assignment: 3 C 25 B

Unit where incident occurred: AH

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Ms. Haught AH mailroom supervisor (by phone) When? About 11/10/14

What was their response? Ms. haught told Ms. Whitsitt she cannot send me ANYTHING FROM ANOTHER INMATE'S PENDING CRIMINAL CASE essentially

What action was taken? Unknown - appeal of contraband decision pending

---

State your grievance in the space provided. Please state who, what, when, where and the disciplinary case number if appropriate

On 11/04/14, at the Hughes Unit mailroom, I was told Ms. Haught the Supervisor had declared legal material's sent to me throught the United States postal Service was being declared "contraband" because it "belonged" to another offender. I pursued the appeal process at that time. First, this legal material belongs to ME, not "another offender" regardless of what Ms. Haughton READ IN THE CORRESPONDENCE/ LEGAL DOCUMENTS. (Please note that reading inmate correspondence is prohibited, without prior written approval of a warden, which was not done here, and then only for a crime or TDCJ rule violation neither of which were cited in the contraband confiscation papers, since having legal documents from criminal cases other than one's own is NOT a TDCJ rule violation) Second, these legal documents were sent to me from Attorney at Law Mr. Walter W. Boyd Jr., State Bar No.02782000, 202 Travis, Suite 208; Houston, Texas 77002, direct from his legal assistant, Kay Whitsitt, 7260 CR 4710, Larue, Texas 75770 (903)675-3345. According to Ms. Whitsitt, it seems Ms. Haught only was familiar with Ms. Whitsitt being a "booseller", but not familiar with the fact that she is Attorney Boyd's legal assistant. Third, Mr. Boyd, Ms. Whitsitt and I am all under a deadline of December 2,2014 which has been made impossible by this imprior legal documents confiscation event. The Texas Court of Criminal Appeals has granted us a time extension because of this specific improper confiscation event. We would appreciate it a great deal if Ms. Haught of the AH mailroom would please return the confiscated legal documents to me ASAP in order to prevent any further complication of a straghtforward issue of simple human error. Thank you.

---



## Texas Department of Criminal Justice
# STEP 2

**OFFENDER GRIEVANCE FORM**

12/17

| OFFICE USE ONLY | |
|---|---|
| Grievance #: | 2015046141 |
| UGI Recd Date: | 12-8-14  DEC 15 2014 |
| HQ Recd Date: | |
| Date Due: | 1/1 |
| Grievance Code: | 305 |
| Investigator ID#: | 14 |
| Extension Date: | |

**Offender Name:** Paul James Koumjian     **TDCJ #** 1039181

**Unit:** AH     **Housing Assignment:** 3 C 25 B

**Unit where incident occurred:** AH

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

**Give reason for appeal (Be Specific).** *I am dissatisfied with the response at Step 1 because...*

The Step 1 response did not respond to my claims, of confiscating legal materials sent to me in the mail. The response did not even address the issue of the confiscation event and it's improper basis. Note that there is no allegation of a crime or a rule violation being committed here. The Step 1 response's claim that "the mailroom cannot be used as a third party" is senseless. The mailroom acts as a party to delivery of the mail daily. I am not communicating with another inmate at all. I am only receiving legal materials from a civilian in the outside world which is a legitimate exercise of my First Amendment rights to Free Speech. So exactly how is the mailroom being used as a third party, and how is that unstated basis for confiscation of my legal materials constitute a crime of TDCJ rule violations, which is the only reason mailroom staff can read correspondence. Without an accusation of criminal conduct (there is none here) or of a TDCJ rule violation (it is not a rule violations to receive legal material from a legitimate citizen on the outside, regardless of the subject matter of the contents), there was no reason for taking my legal materials. Please return them. These legal materials confiscated without Due Process by being read for content and determined to violate some unstated TDCJ rule, without being authorized by a TDCJ warden or his designeee to be read, cost at least 196.00 to reproduce for me. Should I be deprived of filing them at the time I'll be allowed by the Texas Court of Criminal Appeals to file them, please advise me who wants to pay that bill? Assistant Warden Armstrong? Mailroom supervisor Haught? Or perhaps this Step 2 reviewer? Please immediately return these confiscated legal materials for being confiscatedbased on no evidence of a crime or TDCJ rule violations being committed by my being sent them. Thank you. Also please retrain your AH mailroom supervisor.

**I-128 Front (Revised 11-2010)**     **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**     **(OVER)**

Appendix G

9

PD-1050-14

IN THE TEXAS COURT OF CRIMINAL APPEALS

COURT OF APPEALS NO.09-13-00180-CR,09-13-00181-CR,09-13-00182-CR,09-13-00183-CR

PETER JAMES MARTIN

v.

STATE OF TEXAS

§
§
§ On appeal from the 221st Judicial
§ District Court of Montgomery County,
§ Texas, Cause No.12-03-02604-CR.
§

RECEIVED IN
COURT OF CRIMINAL APPEALS
NOV 07 2014
Abel Acosta, Clerk

PETITIONER'S ADVISORY OF PRISON OFFICIAL'S CONFISCATION OF
HIS PETITION FOR DISCRETIONARY REVIEW DOCUMENTS FROM
THE MAIL AND FURTHER MOTION FOR EXTENSION OF TIME

Petitioner Martin has been using the legal assistance of inmate Paul James Koumjian, #1039181, since during his court of appeals litigation, with the implicit approval of the court of appeals. See Atts.1-4(Pet's letter to Carol Anne Harley, Clerk, to allow Koumjian to file motions for him, Clerks notice allowing the filing of specific motion pursuant to request). Thereafter Petitioner Martin executed a sworn affidavit granting Paul James Koumjian limited power of attorney authorizing him "to file any legal documents on my behalf, in any court action related to my convictions in Mongomery County Cause Number 12-03-02604-CR." See Att.5(Sept.23,2014 notarized, sworn, Limited Power of Attorney). On or about November 4,2013 Paul James Koumjian was notified by prison officials to come to the mailroom, see Att.6, where he was told that documents sent from Kay Whitsitt of 7260 CR 4710, Larue, Texas 75779 concerning Petitioner Martin's instant PDR case #PD-1050-14, were being confiscated because "All legal documents on another offender", i.e., Mr. Martin in the instant case. See Att.7(I-153 "Correspondence/Contraband Denial Form" offender copy). These documents confiscated are the result of copying work done by Kay Whitsitt of the pleadings and/or appendix exhibits, intended to be filed in ten (10) copies as required by the Texas Rules of Appellate Procedure, with this Court in the instant case. A written complaint directly to the prison mailroom supervisor was mailed on November 5th,2014, hoping against better experience that Martin's pleadings and exhibits will be returned to Mr Koumjian to facilitate his collating and organizing them into a cogent and coherent presentation for this Court by the present deadline date of December 2nd, 2014. See Att.8(Written Notice to Mailroom Supervisor, this Court and the beaumont Court of Appeals).

There is no rule against inmate's mailing other inmates legal documents to the courts in TDCJ-CID. Under TDCJ Correspondence Rules, published on the internet at "http://www.tdcj.state.tx.us/publications/cid/OffendOrientHbkNov04.pdf" at Offender Orientation Handbook, Chapter 3(Uniform Offender Correspondence Rules) and 4(Offender Access to the Courts, Counsel and Public Officials Rules), inmates may correspond with as many persons as he chooses, and "with other prisoners about legal matters". id., Corr.R.3.9.1.1 & 3.9.1.2. Under the rule as written, "contraband" is defined as "shall not, therefore, include any written material disapproved for its content. Under no circumstances shall inspection for contraband be deemed to require the reading or scanning of correspondence." id., Corr.R.3.9.1.8; see also, Corr.R.3.9.1.16.

FILED IN
No unit
COURT OF CRIMINAL APPEALS
NOV 07 2014
Abel Acosta, Clerk

-1-

or facility shall have a rule or practice contrary to the foregoing..." id., Corr.R.3.9.1.17.

Additionally, under the Uniform Access to Courts Rules, TDCJ Officials "Shall not interfere with, harass, punish or otherwise penalize any offender" for his "participation in litigation ... or for discussing with others or writing to others about actual or potential legal action...","No unit or facility shall have a rule, policy or practice contrary to the foregoing general policy." Uniform Access to Courts ("UAC") Rules, Part II (TDCJ Policy) In all searches or shakedowns of inmate's legal materials, "the personal legal materials ... belonging to a TDCJ offender are confidential. They may not be read as part of a search or shakedown. id., UAC Rules, Part IV.B.1. "[I]n fact legal materials ... are not contraband, and ... may not be read." id., UAC Rules, Part IV.B.2. "Offenders shall be permitted to advise or assist each other on all legal matters." id., UAC Rules, Part IV.B.1. "An offender's personal legal materials may only be searched for **written contra-band (such as escape plans, evidence of the commission of a crime or a viola-tion of TDCJ Rules and Regulations)** if there is reasonable suspicion that written contraband is included in them. This must be documented in writing and approved by the Warden...". id., UAC Rules, Part IV.B.2.

These correspondence and access to courts rules are binding upon prison officials under "Accardi-Doctrine". <u>Kossie v. Cain</u>,602 F.Supp.2d 786,891(S.D. Tex.2006)(citations omitted); <u>Ruiz v. Estelle</u>,503 F.Supp.1265,1356(S.D.Tex. 1980)(citations and subs.hist.omitted). Additionally, the rights to Free Speech and to Access the Courts protect against this kind of confiscation. <u>Samford v. Dretke</u>,562 F3d 674,678-69(5th Cir.2009); <u>Brewer v. Wilkerson</u>,3 F3d 816,825-26(5th Cir.1993); <u>Taylor v. Sterret</u>,532 F2d 462,476(5th Cir. 1976). In <u>Procunier v. Martinez</u>,416 U.S.396,412-16(1974), the Supreme Court stated the rule of law which remains so to this day is that only outgoing correspondence concerning escape plans, ongoing criminal activity or threats of blackmail, posed a threat to prison security sufficient to justify censor-ship by confiscating inmate's legal documents from the mail.

Here, prison officials violated their own correspondence and/or access to the courts rules, by reading inmate's personal legal materials, in order to determine whose case was being litigated in court which is also off limits under these rules. Without this Due process violation, prison officials could not have determined one inmate was getting mailed another inmate's legal docu-ments, and presumably would have been delievered without interfering with the instant PDR case's litigation. Surely, the TDCJ's definition of "written contraband" in bold hereinabove is overbroad by including the "violation of TDCJ Rules or Regulations" when compared to Procunier's and Sterret's formulations of the rule. Then, there is NO TDCJ RULE PROHIBITING ONE INMATE FRM MAILING ANOTHER INMATE'S LEGAL MAIL TO THE COURTS. If there is, it is only in TDCJ administrator's wish list of rules, but certainly not committed to any written rule in the Correspondence Rules or the Uniform Acccess to Courts Rules. The documents intended to be filed in continuation of this pro-se inmate effort at vindication of constitutional rights in the instant case, obviously do not contain escape plans, do not describe ongoing criminal activ-ity or involve blackmail, as required for TDCJ officials to CONFISCATE LEGAL DOCUMENTS destined for this Court's pending docket! The Texas courts, and not TDCJ prison officials, are supposed to be the judges of what will and what will not be filed in their jurisdictions. Under this rule regime, TDCJ could confiscate and never return intended court filings and thus prevail in criminal law matters by confiscatory events becuase the inmate committed a TDCJ rule violations, although none has been cited or committed here!

-2-

10-2

Petitioner seeks leave to file an extra-ordinary motion necessary to protect the Court of Criminal Appeals jurisdiction in the instant case, for the Hughes Unit Senior warden to direct the Hughes Unit Mailroom Supervisor to return the confiscated legal documents mailed to Paul James Koumjian and intended for Peter James Martin's instant petition for discretionary review proceeding. This Court has the power to issue "in criminal law matters, writs of mandamus" and "such other writs as may be necessary to protect its jurisdiction or enforce its judgements." Vernon's Ann.Const.Art.V,§5; Vernon's Ann.C.C.P.Art.4.04,§1; State ex rel Wade v. Mays,698 S.W.2d 893(Tex.Crim.App. 1985). "Criminal Law Matters" include "[d]isputes which arise over the enforcement of statutes ... and which arise as a result of or incident to a criminal prosecution..." Curry v. Wilson,853 S.W.2d 40(Tex.Crim.App.1993).

Here, TDCJ prison officials has acted to deprive this Court of it's power to decide the petition for discretionary review case pending before it at this time, due to abusing it's unique discretion to control every aspect of TDCJ prisoner's lives. Should prison official's abusive confiscation of the documents at issue intended to be filed in the instant case be allowed to go unremedied, the Petitioner will have NO remedy at law in a petition for discretionary review proceeding, never mind not have an "adequate remedy at law". While some other remedy may technically exist, such as the TDCJ grievance procedure or the specific appeal process noted on the attached I-153 form at Att.7, these remedies are so uncertain, tedious, burdensome, slow, inconvenient, inappropriate, or ineffective as to be deemed inadequate to minimally meet this Court's present deadline of December 2nd,2014 with an unobstructed filing of these confiscated documents. E.g.,Greenwell v. Court of Appeals for Thirteenth Judicial Dist.,159 S.W.3d 645,648-49(Tex.Crim.App.2005) (mandamus available where court of appeal erroneously ordered trial court to correct a certificate fo appealability), quoting, Smith v. Flack,728 S.W.2d 784,792(Tex.Crim.App.1987).

Petitioner respectfully requests this Court GRANT another extension of time to file his petition for discretionary review documents in this Court from the present date of December 2,2014 to thirty additional days from then, until January 1,2014. Petitioner has obtained two previous motions for extensions of time, based on his pro-se status, unconstitutionally convicted condition, financial poverty and being forced to specifically send documents back and forth through the mail to Ms. Kay Whitsitt in order for Mr. Paul Koumjian #1039181 to formulate and process legal documents, arguments and exhibits in the instant direct appeal case which takes an inordinate amount of time logistically. Prison officials had not previously interfered with the Petitioner's legal documents being mailed in and out of the prison system for processing by Mr. Koumjian until this incident occurred on November 3rd, 2014 where Hughes Unit Mailroom officials confiscated all the photocopies of all the PDR documents to be collated by Mr. Koumjian and then mailed to this Court in Case No.PD-1050-14 herein. Petitioner is proceeeing in good faith and not for any purposes of harassment or delay of the Court or the State. Indeed, the Petitioner will show this Court that he is ACTUALLY INNOCENT of at least one of the charges, and was only convicted by way of suppressed evidence, false testimony, failure to correct perjury when it appeared and other fundamental structural error exposing a miscarriage of justice in the trial court below having occurred. The court of appeals decision was an affirmance on May 21,2014, rehearing denied on July 24,2014, en banc consideration overruled on September 4th,2014.

-3-

10-3

## PRAYER

WHEREFORE PREMISES CONSIDERED, the Petitioner respectfully prays this Court will GRANT him the relief he is entitled to under the above facts and law in the instant case, including another extension of time for good cause shown and a order to the Hughes Unit Senior Warden directing him to return Peter james martin's legal documents to Paul James Koumjian forthwith.

## CERTIFICATE OF SERVICE

I certify and affirm placing a true and correct copy of this instrument into the prison mailbox this day November 5,2015 addressed to Jason Larman, Ass't D.A. in charge of appeal,207 W. Phillips St. Conroe, Tx.77301.

Respectfully Submitted

*Peter James Martin*

Peter James Martin, #1846003,
Hughes Unit, Rt.2, Box 4400
Gatesville, Texas 76597

10-4

PD-1050-14

12/19/2014

**MARTIN, PETER JAMES   Tr. Ct. No. 12-03-02604-CR**

On this day, this Court has denied the Appellant's Pro Se "Motion To Order State
To Return Confiscated Documents to Appellant."

Abel Acosta, Clerk

PETER JAMES MARTIN
MICHAEL UNIT - TDC# 1846003
2664 FM 2054
TENNESSEE COLONY, TX  75886

OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS   FILE COPY
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

COA No. 09-13-00180-CR

PD-1050-14

12/31/2014
MARTIN, PETER JAMES    Tr.Ct. No. 12-03-02604-CR
The appellant's pro se petition for discretionary review has this day been received
and filed.

Abel Acosta, Clerk

PETER JAMES MARTIN
MICHAEL UNIT - TDC# 1846003
2664 FM 2054
TENNESSEE COLONY, TX  75886

12

11/12/2014                                          COA Case No. 09-13-00180-CR
MARTIN, PETER JAMES    Tr. Ct. No. 12-03-02604-CR         PD-1050-14
On this day, this Court has granted the Appellant's Pro Se motion for an extension
of time in which to file the Petition for Discretionary Review. The time to file the
petition has been extended to Friday, January 02, 2015. NO FURTHER
EXTENSIONS WILL BE ENTERTAINED. NOTE: Petition For Discretionary
Review must be filed with The Court of Criminal Appeals.

                                                    Abel Acosta, Clerk

                    9TH COURT OF APPEALS CLERK
                    CAROL ANNE HARLEY
                    1001 PEARL SUITE 330
                    BEAUMONT, TX 77701
                    * DELIVERED VIA E-MAIL *

13

**1/23/2015**                                                       **COA No. 09-13-00180-CR**
**MARTIN, PETER JAMES     Tr. Ct. No. 12-03-02604-CR          PD-1050-14**
On this day the Appellant's Pro Se motion to exceed the page limit has been denied.

Abel Acosta, Clerk

PETER JAMES MARTIN
MICHAEL UNIT - TDC# 1846003
2664 FM 2054
TENNESSEE COLONY, TX  75886

14

2/4/2015
**MARTIN, PETER JAMES**   Tr. Ct. No. 12-03-02604-CR
COA No. 09-13-00180-CR
PD-1050-14

On this day, the Appellant's Pro Se petition for discretionary review has been refused.

Abel Acosta, Clerk

9TH COURT OF APPEALS CLERK
CAROL ANNE HARLEY
1001 PEARL SUITE 330
BEAUMONT, TX 77701
* DELIVERED VIA E-MAIL *